Robert J. GILMORE and Noah Liff, Plaintiffs,

v.

John Gordon BERG, Harold M. Winston, Stephen T. Marcoe, Jr., Rosalind Schneider, Martin R. Barker, Howard Green, Gilbert Tucker, Cooper River Office Building Associates, American Real Estate Associates, Inc., Management of Cooper River, Inc. Office Buildings of Cooper River, Inc., Pat Charles, Charles, Sturm & Masters and Norman S. Cohen, Defendants.

Civ. No. 86–4694(SSB).

United States District Court, D. New Jersey.

April 5, 1991.

Howard Kaufman, Steven Coren, Kaufman, Coren & Ress, Philadelphia, Pa., and Manya Kamerling, Haddonfield, N.J., for plaintiffs.

John W. Markwardt, Horn, Kaplan, Goldberg, Gorny & Daniels, Voorhees, N.J., for defendants Pat Charles and Charles, Sturm & Masters.

Justin T. Loughry, Tomar, Simonoff, Adourian & O'Brien, Haddonfield, N.J., for defendant Norman S. Cohen.

Fredric R. Cohen, Katz, Ettin, Levin & Kurzweil, Cherry Hill, N.J., for defendant Gilbert Tucker.

Michael S. Silberman, Philadelphia, Pa., for defendants John Berg, Cooper River Office Bldg. Assoc., American Real Estate Assoc., Inc., Mgt. of Cooper River, Inc., Office Bldgs. of Cooper River, Inc.

Andrew Karcich, Sherman, Silverstein & Kohl, Pennsauken, N.J., for defendant Martin Barker.

Howard I. Green, pro se.

BROTMAN, District Judge.

This matter is presently before the court on the separate motions of defendant Pat Charles and Charles, Sturm & Masters (hereinafter "Charles"), and defendant Norman Cohen to dismiss or stay these proceedings pending the outcome of a related tax court case, or in the alternative, to dismiss or grant summary judgment on various counts of the complaint. These defendants played limited roles in the offering of a private placement memorandum (offering memorandum) on which plaintiffs allegedly relied in their purchase of stock in a real estate limited partnership venture. Combined, these two defendants argue that, as to them, (1) the statute of limitations bars plaintiffs' Section 10(b) and Rule 10(b)(5) claims,[1] (2) scienter cannot be established, (3) there could be no justifiable reliance on the offering memorandum, (4) the RICO counts should be dismissed because of certain pleading deficiencies, for failure to prove a pattern of racketeering activity, and because the statute is unconstitutionally vague, and (5) the pendent state claims should be dismissed on several separate grounds.

BACKGROUND

In December of 1980, plaintiffs Robert J. Gilmore and Noah Liff purchased unregistered securities in Cooper River Office Building Associates ("CROBA"), a New Jersey limited partnership. The information regarding the limited partnership was contained in the offering memorandum, dated September 19, 1980.

The Amended Complaint alleges that on December 13, 1980, Office Buildings of Cooper River, Inc. ("OBCR"), a Nevada corporation owned by defendants Berg (50 percent), Green (25 percent) and Tucker (25 percent), purchased two commercial office buildings and the underlying parcel of land, located in Pennsauken Township, New Jersey, from a bankrupt entity in Camden New Jersey, for a price of $2,500,000. Plaintiffs allege that on that same day, OBCR sold the two buildings for a sum of $4,700,000 and leased the accompanying land for a 17-year term to defendant Management of Cooper River, Inc. ("MCR"), a wholly owned subsidiary of defendant American Real Estate Associates, Inc. ("AREA"), a company controlled by Berg. Also on that same day, MCR sold the two buildings and assigned the lease to its parent AREA for the sum of $5,300,000. Plaintiffs describe the December 13, 1980 transactions as an "illegal scheme" concocted by defendants to impair the value of their investment.

Specifically, plaintiffs allege that defendants failed to disclose the "step-up" in the purchase of the two buildings (i.e., the difference between the purchase price of $2,500,000 originally paid by AREA and the $5,300,000 purchase price ultimately paid by the limited partnership), which "substantially diminished the likelihood that the plaintiffs and the other investors would realize the desired profits and appreciation, caused an inflated basis on the property for federal income tax purposes, and misled the plaintiffs and other investors into believing, *inter alia*, that they would be afforded substantial depreciation and interest deductions." Plaintiffs' Amended Complaint at ¶ 38.

Plaintiffs filed suit in this court on November 26, 1986 alleging financial injury in the form of loss of investment, lost tax deductions and credits, and substantial interest and penalties due to defendants' fraudulent misrepresentations, concealments and omissions. Plaintiffs allege violations of Section 10(b) of the Securities and Exchange Act of 1934, Sections

---

**1.** If this argument succeeds, the federal securities claims would be dismissed as to all defendants.

1962(a)–(d) of the Racketeering Influenced and Corrupt Organizations Act (RICO) and numerous state common law and statutory provisions.

On June 24, 1987, this court denied defendants' motions to dismiss without prejudice and granted plaintiffs leave to amend their complaint. Defendants then renewed their motions to dismiss primarily on grounds that plaintiffs' federal claims were barred by New Jersey's two-year discovery rule of limitations and that their RICO claims did not state a claim upon which relief could be granted. This court, on July 28, 1988, denied all of defendants' motions to dismiss except as to claims under the Tennessee Consumer Protection Act. In doing so, this court found that a disputed issue of material fact existed as to when plaintiffs knew or should have known of defendants' fraudulent acts. Plaintiffs then sought an order certifying the suit as a class action, which was denied July 21, 1989 for failure to satisfy the numerosity requirement.

The facts relevant to the present motions involve the limited roles played by Charles, an attorney who prepared a tax opinion letter, and Cohen, an accountant who prepared a report on the projected financial performance of the partnership. Both documents were attached to the offering memorandum, which referred to Charles and Cohen as "experts." According to Charles' certification provided to the court, Berg contacted Charles in April of 1980 and retained him to represent AREA in connection with the purchase of CROBA out of bankruptcy. In May of 1980, Berg informed Charles that if AREA were successful, Berg would probably syndicate the property, and asked Charles to prepare a tax opinion letter, which AREA would use in syndicating the property. Berg told Charles that Berg and a tax attorney had drafted a tax opinion letter, which was then submitted to Charles for his review, along with the proposed offering memorandum. Prior to this time, Charles had never been hired to render tax advice relating to any syndication. Charles reviewed the letter, conducted legal research, revised the letter and agreed to sign it as revised. Berg and Charles agreed on the revised letter on June 13, 1980, and Berg then put it on Charles' stationary. The letter states that the purchase price of $5.3 million reflects the fair market value of the property as determined by AREA, and that the opinion would be amended to reflect any variation between information in the offering memorandum and later developed facts.

Several weeks later, Berg told Charles that he would not request Charles to sign the letter and would not send it to proposed investors until after the closing of title on the property. Plaintiffs say that, according to his own deposition testimony, Charles understood the letter was to be included in the offering memorandum. Plaintiffs' Brief in Opposition, p. 5. Sometime prior to December, 1980, Charles learned that Berg was selling interests in the syndication but he says he was not aware that his tax opinion letter was part of it. In fact, Berg started actively soliciting limited partners through the offering memorandum, which included Charles' tax opinion letter, sometime in July of 1980.

Around this same time, Charles helped obtain bankruptcy court approval of the proposed AREA purchase and prepared the documentation necessary to close title, which took place at two meetings—December 15, 1980 and January 13, 1981. Charles and Berg agreed on a flat fee of $9,000, plus costs, for all of Charles' legal services, which was paid in full at the final closing. Two weeks later, at Berg's request, Charles executed the tax opinion letter and sent it to Berg. Thereafter, Charles provided limited legal services to Berg and his controlled entities.

An important event during the syndication of CROBA was the preparation of a draft "errata" sheet that was meant to inform prospective investors of, *inter alia*, (1) the purchase out of bankruptcy for $2,500,000, (2) Berg's full role in the transaction, and (3) the step-up in price from $2.5 million to $5.3 million. Charles received the errata sheet sometime in November of 1980 and was told by Berg not to worry about it. Plaintiffs Gilmore and Liff claim that there is no evidence they ever

received the errata sheet and, therefore, they never knew these material facts before purchasing their interest in CROBA.

As to defendant Cohen, Berg retained him in June of 1980 to review a set of financial projections for the limited partnership and to prepare and sign a forecast letter to be included in the offering memorandum. ·Cohen had been Berg's personal accountant for many years, and had prepared financial statements and tax returns for Berg's Fidelity America Mortgage Company (FAMCO) limited partnerships. Berg gave Cohen a set of projections, assumptions to the projections and a draft forecast letter. Cohen prepared the forecast letter and delivered it to Berg in July of 1980 for inclusion in the offering memorandum. The disputed language of that letter on which plaintiffs stake their claims against Cohen reads:

> My review [of AREA's projections and assumptions] included tests of the computations, inquiries as to the methods of compiling the data set forth in the projections, discussions with officials of the General Partner [AREA] and such other procedures as I considered necessary in the circumstances. No other verification procedures were applied. I believe that the assumptions and rationale underlying the projected financial statements are reasonable for the purposes of these projections.
>
> Since the projections are based on assumptions, the reliability of which is dependent on future events and transactions, as an independent accountant, I do not express an opinion on the fairness of these projections.

Cohen's work on the letter was limited to one meeting with Berg, and several hours performing computations, for which he was paid $3,000.

DISCUSSION

A. *Motion to Stay*

■ This court already has denied previous motions to stay—in 1987 and 1988. Defendants Charles and Cohen assert that new information is now before the court that shows that a substantial portion of the damages claimed by plaintiffs will be determined by a pending tax court proceeding. Therefore, since plaintiffs' damages are hypothetical, the court should exercise its discretion to stay this entire proceeding pending the outcome of the tax court's ruling. Alternatively, the court should find the dispute unripe.

Even accepting defendants' argument, plaintiff has alleged loss of investment as well as potential tax disallowances, penalties and interest assessments. The power to stay is discretionary. *Bechtel Corp. v. Local 215, Laborers' Int'l Union*, 544 F.2d 1207, 1215 (3d Cir.1976). This litigation has continued for over four years and the court thinks it would be unwise to issue a stay or find the dispute unripe at this juncture. The motion will be denied.

B. *Statute of Limitations for § 10(b) Claims*

■ Both defendants are now raising the argument for the first time that the one year/three year rule of *In re Data Access Systems Securities Litigation*, 843 F.2d 1537 (3d Cir.) (en banc), *cert. denied sub nom. Vitiello v. Kahlowsky*, 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988) should be retroactively applied to bar plaintiffs' claims of federal securities fraud. The court had an opportunity recently to address this question in a similar case, *Panna v. Firstrust Sav. Bank*, 749 F.Supp. 1372 (D.N.J.1990), *modified on other grounds*, 760 F.Supp. 432 (1991).

The Third Circuit in *Data Access* established that the limitations period applicable to § 10(b) and Rule 10b–5 claims was one year after plaintiffs discovered facts constituting the violation, and in no event more than three years after such violation. 843 F.2d at 1550. In that case, the Third Circuit reviewed recent Supreme Court pronouncements on the proper method for borrowing analogous limitations periods. *See Agency Holding Corp. v. Malley–Duff & Assocs., Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987), *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985) and *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 103 S.Ct.

2281, 76 L.Ed.2d 476 (1983). It then rejected this court's determination that the analogous state common law fraud limitations period should apply. Instead, it looked to the analogous federal limitations period and concluded that the express limitations provisions of the Securities and Exchange Act of 1934 should apply.

A straightforward application of the *Data Access* rule to this case would require plaintiffs to have filed suit within one year from the time of discovery and in any event within three years from the time the violation occurred. Since the violation allegedly occurred in connection with the offering and sale of securities between September and December, 1980, and the complaint was not filed until November, 1986, plaintiffs are clearly time-barred. They must persuade the court, therefore, that the rule of *Data Access* should not be applied retroactively.

The question of retroactive application of the new one year/three year rule established by *Data Access* was not answered by the court on that occasion. The Third Circuit resolved that question in 1988 in the case of *Hill v. Equitable Trust Co.*, 851 F.2d 691, *cert. denied*, 488 U.S. 1008, 109 S.Ct. 791, 102 L.Ed.2d 782 (1989), and has considered it since in *McCarter v. Mitcham*, 883 F.2d 196 (1989), *Gatto v. Meridian Medical Associates, Inc.*, 882 F.2d 840 (1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990), and most recently in *Gruber v. Price Waterhouse*, 911 F.2d 960 (1990). The limitations period should be applied retroactively unless the party attempting to avoid retroactive application persuades the court that the rule should be applied prospectively only. *Hill*, 851 F.2d at 696–97. The method for applying the "uncommon exception" of prospective application of the *Data Access* rule requires a case-by-case analysis of the three-part test enunciated by the Supreme Court in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). *Id.*, at 697; *Gruber*, 911 F.2d at 964–65. These factors are premised on a general assumption that judicial decisions should be applied retroactively. *In Re National Smelting of New Jersey, Inc.*, 722 F.Supp. 152, 157 (D.N.J.1989).

The three-part test of *Chevron Oil* states:

First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis for avoiding the 'injustice or hardship' by a holding of nonretroactivity."

*Chevron Oil*, 404 U.S. at 106–07, 92 S.Ct. at 355 (citations omitted). In applying the first part, "[p]rior precedent must be 'sufficiently clear that a plaintiff could have reasonably relied upon it in delaying suit, a criteria that was not met where the law was erratic and inconsistent.'" *Hill*, 851 F.2d at 696, quoting *Fitzgerald v. Larson*, 769 F.2d 160, 163 (3rd. Cir.1985). Although the court in *Hill*, *McCarter* and *Gatto* found that *Data Access* did not overrule clear past precedent which was sufficient to warrant justifiable reliance by plaintiff, the inquiry is "fact sensitive," requiring the court to examine whether the facts of this case have been clearly decided in prior cases. *Gruber*, 911 F.2d at 965 (citations omitted). Therefore, the court must examine the law as it existed at the time plaintiffs' cause of action arose and any changes which may have occurred prior to the time the complaint was filed. *Id.*

In approaching that exercise, the court must first recognize the Third Circuit's "legal conclusion" that no clear precedent on the applicable New Jersey limitations period for Rule 10b–5 actions existed at the time *Data Access* was decided in 1988.

*McCarter,* 883 F.2d at 203; *Gatto,* 882 F.2d at 843. In *Gatto,* plaintiffs were investors who purchased limited partnership interests in real estate as a tax shelter. They filed suit in 1987, alleging fraudulent inducement to purchase their limited partnership interests six years earlier in violation of § 10(b) and Rule 10b–5. They invoked Third Circuit precedent regarding limitations period under New Jersey law for § 10(b) and Rule 10b–5 claims as ground for prospective application of *Data Access.* The *Gatto* court rejected their argument on the basis that the *Hill* court found that no clear precedent existed at the time their cause of action arose as to the appropriate limitations period in New Jersey for § 10(b) and Rule 10b–5 claims. *Gatto,* 882 F.2d at 843. Furthermore, *Data Access* did not resolve an issue of first impression. These conclusions were made as a matter of law. *Id.*

Plaintiffs in this case stand in an almost identical position to those in *Gatto.* At the time they purchased limited partnership interests in CROBA as a tax shelter in 1980, Third Circuit precedent regarding the New Jersey limitations period for 10b–5 violations brought by buyers against sellers of securities was no clearer than in 1981, when the claim in *Gatto* accrued.[2] The court must accept this as a matter of law and need not repeat the *Data Access, Hill* and *Gatto* courts' analysis of conflicting Circuit precedent on this issue.

Another important factor weighing against plaintiffs is the *Gatto* court's analysis of justifiable reliance, which is an important element of the first *Chevron* factor. If plaintiffs could not know the significant operative facts underlying their cause of action until after the absolute bar period of *Data Access* had passed, they could not possibly have relied on a longer statute of limitations period. *Gatto,* 882 F.2d at 843. Here, plaintiff Liff alleges in the amended complaint that he "became aware of the fraudulent and other wrongful conduct ... on or about April 2, 1986, when he received an IRS agent's examina-

tion report that disclosed many of the facts that defendants had concealed and misrepresented." Amended Complaint at ¶ 54. Plaintiff Gilmore alleges his discovery through identical circumstances on June 14, 1986. However, this was at least twenty-eight months after the three-year absolute bar of *Data Access* had lapsed. As long as plaintiffs were ignorant of their causes of action, they could not possibly have relied on any limitations period. Therefore, the court concludes that plaintiffs have failed to show that, as to their particular claim and the factual circumstances surrounding it, *Data Access* overruled clear past precedent on which they could have relied.

In an effort to persuade the court otherwise, plaintiffs draw our attention to Chief Judge Gerry's opinion in *In Re National Smelting, supra.* In that case, Judge Gerry interpreted *Data Access* to mean that its one year/three year rule should not be applied retroactively when plaintiffs' claims would have been timely under both of the analogous state limitations periods. *In Re National Smelting,* 722 F.Supp. at 158. "When this is the situation, we believe that *Data Access* is appropriately seen as overruling clear past precedent upon which plaintiffs could have reasonably relied." *Id.* Plaintiffs argue that since their complaint would be timely filed under either the six-year New Jersey common law fraud limitations period or the two-year New Jersey blue sky statutory limitations period, the reasoning in *In Re National Smelting* should apply.

The argument has considerable appeal. However, to the extent *In Re National Smelting* stands for such a proposition, the court believes that the Third Circuit's decision in *Gatto* has overtaken its holding. Resting principally on the issue of whether plaintiffs justifiably relied on clear precedent in delaying suit, the Third Circuit ruled that plaintiffs must know of their cause of action in order to rely. Thus, the *Gatto* decision effectively bars any pre-

---

**2.** As the *Gatto* court noted, the Third Circuit opinions in *Roberts v. Magnetic Metals Co.,* 611 F.2d 450 (1979) and *Biggans v. Bache Halsey*

*Stuart Shields, Inc.,* 638 F.2d 605 (1980) were "written by sharply divided panels [and] did not establish clear precedent...." 882 F.2d at 843.

*Data Access* § 10b claims filed after the three-year absolute bar has passed, regardless of when plaintiffs discovered the fraud or their well-pleaded allegations of fraudulent concealment.[3]

The court now turns to the second criterion of the *Chevron* test. That component "requires a weighing of the 'merits and demerits of each case' to ascertain whether the retroactive operation would further or retard the rule." *Gruber,* 911 F.2d at 967. In every case in which the Third Circuit has considered the retroactivity of *Data Access,* it has ruled that the second factor "does not 'militate clearly either in favor of or against retroactive application' and is therefore neutral." *McCarter,* 883 F.2d at 204, *quoting Al–Khazraji v. Saint Francis College,* 784 F.2d 505, 513 (3d Cir.1986), *aff'd,* 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1986). None of the parties have forwarded an argument to the contrary, and the court sees no reason not to rely on prior decisions finding the second criterion neutral.

Finally, the third criterion of *Chevron* requires that the court examine the inequities, injustice or hardship to plaintiffs if retroactive application were given to *Data Access* in this case. As the Third Circuit noted in *Gatto,* "the third *Chevron* factor in practice overlaps with that of the first factor, "in that it would be inequitable to give retrospective application to a shortening of the limitations period that altered established law upon which plaintiff could have reasonably relied." 882 F.2d at 844, *quoting Fitzgerald v. Larson,* 769 F.2d at 164. Once again the court is faced with the fact that plaintiffs could not have reasonably relied on either the New Jersey general fraud or blue sky statute in delaying suit when they were totally ignorant of their claims until April and June, 1986.

The third criterion of *Chevron,* however, is not limited solely to the justifiable reliance issue. Other factors courts have weighed in the equity balance include lengthy and costly discovery practice "for a

year," *Chevron,* 404 U.S. at 108, 92 S.Ct. at 356; whether defendant has consistently maintained that plaintiff's action was time-barred because of the particular statute of limitations at issue, *Smith v. City of Pittsburgh,* 764 F.2d 188, 196 (3d Cir.1985); whether plaintiff was put on notice by defendant's pleading of that particular defense, *id.;* whether the case was tried or one in which there was already "massive discovery," *id.; In Re National Smelting,* 722 F.Supp. at 160; and whether retroactive application of *Data Access* would bar plaintiff's claim when it would not otherwise be barred by the applicable state limitations period, *Gruber,* 911 F.2d at 968; *Cohn v. G.D. Searle & Co.,* 784 F.2d 460, 467 (3d Cir.1986) ("[d]ismissal of plaintiffs [sic] claim here would, of course, forever bar it"); *Newfield v. Shearson Lehman Bros.,* 699 F.Supp. 1124, 1126 (E.D.Pa. 1988).

The unique circumstances of this case lead the court to find that all these equitable factors weigh against retroactive application. For example, in 1987, this court ruled, *and all parties agreed,* that New Jersey's two-year discovery rule should apply. *Gilmore v. Berg,* No. 86–4694, June 24, 1987, *slip op.* at 8. After plaintiffs amended their complaint to plead when they discovered the fraud and fraudulent concealment, the court found that a disputed issue of material fact existed as to when plaintiffs should have known of their cause of action. Although this ruling was made on July 28, 1988, three months after *Data Access,* no one presented that case to the court and the court did not consider it in making its ruling. Therefore, although plaintiffs were on notice of defendants' argument that their securities fraud claim was untimely, nothing prepared them for this last-minute defense of *Data Access* retroactivity. Only now, two years after summary judgment was denied, over four years after the complaint was filed, and after the completion of extensive and costly

---

**3.** In *In Re National Smelting,* plaintiffs did bring suit within the three-year absolute bar, although

the court did not rest its holding on this fact. *Id.* at 160, n. 8.

discovery,[4] do two of the defendants raise the *Data Access* retroactivity issue for the first time. Moreover, if *Data Access* is applied retroactively, plaintiffs will lose their federal securities claims when they would not otherwise be barred under *either* the New Jersey two-year discovery rule or the six-year common law fraud rule.[5]

Having examined the three *Chevron* factors, the court is left with the following conflict: On the one hand, plaintiffs could not have relied on clear precedent because they did not know the operative facts underlying their securities fraud claim until after the three-year absolute bar had passed. On the other hand, they, the defendants and the court moved forward through over four years of intense litigation on the joint understanding that New Jersey's two-year discovery rule applied and, assuming they could prove fraudulent concealment at trial, their securities fraud claim was timely. For guidance in resolving this conflict, the court notes that the *Chevron* test is inherently one of fairness. Plaintiffs's securities fraud claim is timely but for the three-year absolute bar handed down in *Data Access*, two years after plaintiffs filed suit. Defendants can still contest these claims on the merits as well as the question of when plaintiffs should have discovered the fraud. Therefore, on grounds that retroactive application of *Data Access* would be unfair to plaintiffs, the court will deny defendants' motion to dismiss Count I as time-barred.

**C. *Failure to Establish § 10(b) Cause of Action***

Defendants Charles and Cohen also bring motions seeking summary judgment against plaintiffs' securities fraud claims for failure to establish a cause of action.

The standard for granting summary judgment is a stringent one. A court may grant summary judgment only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Hersh v. Allen Prods. Co.*, 789 F.2d 230, 232 (3d Cir.1986); *Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir.1983). In deciding whether there is a disputed issue of material fact the court must view all doubt in favor of the non-moving party. *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismissed*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984); *Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir.1972). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Recent Supreme Court decisions mandate that "a motion for summary judgment must be granted unless the party opposing the motion can produce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring) (citing *Anderson*, 477 U.S. 242, 106 S.Ct. 2505 and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Moreover, once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary

---

**4.** For the purposes of this motion alone, the parties submitted briefs and appendices totaling hundreds of pages.

**5.** Thus, the court relies on *In Re National Smelting* to the extent its reasoning is relevant to the third rather than the first factor of the *Chevron*

test. It did not take that step in *Panna* because there the court was not faced, as it is here, with parties who unanimously relied on the two-year discovery rule in litigating this suit for over four years.

judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

Section 10 of the Securities Exchange Act of 1934 makes it unlawful to "employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention" of any rule promulgated by the Securities and Exchange Commission (SEC) designed to protect the investing public. SEC Rule 10b–5 makes it unlawful: (1) "To employ any device, scheme, or artifice to defraud," (2) "To make any untrue statement of a material fact" or to omit to state a material fact so that the statements made "in light of the circumstances" are misleading, and (3) "To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." An individual may be primarily liable, through his own misrepresentations or omissions, *Hartman v. Blinder,* 687 F.Supp. 938 (D.N.J.1987), and/or secondarily liable, as an aider and abettor of the fraudulent conduct of others, *Gould v. American–Hawaiian Steamship Co.,* 535 F.2d 761 (3d Cir.1976).

■ The elements of a claim of primary liability are (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused his injury. *Hartman,* 687 F.Supp. at 941. A misrepresentation or omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). It is well settled that projections, forecasts and opinions are actionable under Rule 10b–5. *Eisenberg v. Gagnon,* 766 F.2d 770, 775 (3d Cir.1985). "An opinion or projection, like any other representation, will be untrue if it has no valid basis, ... but 'a reasoned and justified statement of opinion, one with

a sound factual or historical basis, is not actionable.'" *Id.* (citations omitted).

**1. Duty to Disclose:** Cohen, and to a lesser extent Charles, argue that they had no duty to disclose certain facts omitted from their opinion letters. They urge the court to apply the "flexible duty" test to examine whether, as non-insiders, they are liable for violations of § 10(b).

■ Corporate insiders and fiduciaries, *e.g.,* officers, directors or controlling shareholders, have a duty to disclose material information in connection with the sale of securities. *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1979). To hold a non-insider liable for fraud for failure to disclose material facts, plaintiffs must show that the non-insider had a duty to disclose. *Id.* Courts have utilized a multi-part "flexible duty" test to determine whether, under the particular facts of the case before it, a duty to disclose exists. The factors include: (1) the relationship between the plaintiff and defendant;[6] (2) the parties' relative access to the information to be disclosed; (3) the benefit derived by the defendant from the purchase or sale; (4) defendant's awareness of plaintiff's reliance on defendant in making its investment decision; and (5) defendant's role in initiating the purchase or sale. *Rudolph v. Arthur Andersen & Co.,* 800 F.2d 1040, 1043 (11th Cir.1986), *cert. denied,* 480 U.S. 946, 107 S.Ct. 1604, 94 L.Ed.2d 790 (1987); *In Re National Smelting,* 722 F.Supp. 152, 170 (D.N.J.1989) (applying all but the second factor) (finding accountant had no duty to disclose); *Hartman v. Blinder,* 687 F.Supp. 938, 941–42 n. 3 (D.N.J.1987) (finding accountant had no duty to disclose); *Mirotznick v. Sensney, Davis & McCormick,* 658 F.Supp. 932, 937 (W.D.Wash.1986) (finding counsel had no duty to disclose). No one factor of the test is determinative, and the analysis to be engaged in by the court is a qualitative one in which the various factors are judged in relation to each other. *Mirotznick, supra* (citations omitted).

---

**6.** Plaintiffs have argued in their briefs that defendants' relationship to the promoter and the transaction itself are relevant components of

this factor. The court can find no case law supporting such a contention.

■ At oral argument, defendants argued that the flexible duty test applies as to both omissions and affirmative misrepresentations. The court disagrees. The Supreme Court in *Chiarella*, in holding that a financial printer employee did not have a duty to disclose material information, distinguished between silence in connection with the sale of securities and affirmative conduct. "At common law, misrepresentation made for the purpose of inducing reliance upon the false statement is fraudulent. But one who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so." 445 U.S. at 227–28, 100 S.Ct. at 1114–15. Therefore, the flexible duty inquiry should be limited to a defendant's potential liability for material omissions and should not concern affirmative misstatements. Since plaintiffs contend that these defendants made material omissions *and* affirmative misstatements, the court will proceed to apply the flexible duty test only to the alleged omissions in their respective opinion letters.[7]

■ Plaintiffs allege the following omissions on defendant Charles' part: 1) failure to disclose his lack of experience and expertise in tax and securities when the private placement memorandum (PPM) described him as an "expert"; (2) failure to disclose reliance on the professional judgment of Berg and an unnamed tax attorney; and (3) failure to disclose facts concerning the purchase out of bankruptcy, the step-up in price and Berg's role in the various corporate entities. As to defendant Cohen, the accountant, plaintiffs allege that he failed to disclose: (1) facts concerning the purchase of the property out of bankruptcy, the step-up in sales price and Berg's role in the various corporate entities; and (2) his assessment of Berg as an "aggressive" syndicator.

The first and fourth factors of the flexible duty test here show a relationship between plaintiffs and these defendants created entirely by the issuance of opinion letters that any reasonable investor would rely on "only to the extent that he or she would expect those statements to be accurate...." *Hartman v. Blinder*, 687 F.Supp. at 942 n. 3. Plaintiffs have presented no evidence that either the lawyer or the accountant played any role in initiating the transaction. Charles received a flat fee of $9,000 plus costs for all of his legal work, including the tax opinion letter and representation of Berg and AREA at the bankruptcy sale. Cohen received a flat fee of $3,000 for seven and one-half hours of work preparing the CROBA forecast letter, an amount exceeding his hourly rate but not contingent on the sale of CROBA securities. Although both Charles and Cohen continued to do some work for CROBA after syndication, there is no evidence to show that this was a contingency arrangement. "The benefits to defendants [must] go beyond the payment of fees for professional services to include some connection to the securities transactions at issue." *Mirotznick*, 658 F.Supp. at 939. Even drawing inferences in favor of plaintiffs, it does not appear so unusual that they continued to work for Berg since both defendants had past working relationships with him. Finally, as to defendants' relative access to the information to be disclosed, the court thinks this weighs in plaintiffs' favor but not so much as to avoid the conclusion that these defendants had no duty to disclose these omitted facts.

Therefore, the court finds that defendants' alleged omissions of material facts are not actionable under § 10b and Rule 10b–5 because these defendants did not have a duty to disclose these facts to these plaintiffs. However, remaining as actionable fraud are the several affirmative misstatements allegedly made by Cohen and Charles in the respective opinion letters, and to those the court now turns.

### 2. Section 10(b) Elements:

■ a) *Materiality* Plaintiffs' proffered expert in securities law identified two alleged material misstatements in Charles'

---

7. Plaintiffs also allege a number of material omissions and misstatements contained in the principal placement memorandum (PPM) but, since these defendants were not responsible for preparing the PPM, the court will disregard them for present purposes.

tax opinion letter: (1) Charles' statement that "the purchase price of $5.3 million reflects the fair market value of the property as determined by the general partner" when Charles knew that this would mislead third parties by omitting material facts, *e.g.*, the purchase of the property out of bankruptcy, the step-up in price and Berg's role in the transaction; and (2) Charles' statement that "[a]ny variation between the facts as set forth in the documentation disseminated to the prospective limited partners, and those facts and details as developed will be amended to accurately reflect such variation" and his subsequent failure to update the letter to include certain material facts. Charles contends that the alleged misstatements were not material to plaintiffs' investment decision.

Essentially, Charles' alleged misstatements concerned the eventual purchase out of bankruptcy, the step-up in price from $2.5 million to $5.3 million and Berg's role in the transaction, "all of which have a direct bearing on fair market value and, thereby, on the tax benefits of the syndication." Plaintiffs' Brief in Opposition at 23. Investors in 1980 were attracted to tax shelters such as CROBA because they allowed taxpayers to take large deductions to offset income. However, non-recourse debt may only be included in an investment's basis, and thus yield tax benefits, if the fair market value of the property equals or exceeds the amount of the debt. *Crane v. Commissioner*, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947); *Estate of Franklin v. Commissioner*, 64 T.C. 752 (1975), *aff'd*, 544 F.2d 1045 (9th Cir.1976). Thus, the fair market value of a property, and the underlying facts in that determination, are material to an investor's decision to purchase securities in the project.

The court agrees with plaintiffs that a jury could find Charles' statement that "the purchase price of $5.3 million reflects the fair market value of the property as determined by the general partner" is so grossly misleading as to constitute actionable fraud in failing to disclose important facts underlying the determination of fair market value. Charles seeks to exculpate his misleading statement by pointing to the

qualifying language, "as determined by the general partner." However, plaintiffs have presented evidence that, by virtue of Charles' representation of AREA in purchasing the property out of bankruptcy for $2.5 million, Charles knew that the fair market value of $5.3 million was insupportable.

The second alleged misstatement will also be preserved for trial, at least as to materiality. Charles seeks to exculpate this statement by pointing to his recollection that Berg said he would distribute the errata sheet with the missing material information sometime before plaintiffs' purchase of CROBA securities. But Charles' tax letter could be read to have obliged himself to update his tax opinion with facts "as developed," which he admits he did not do or even give thought to doing because he expected Berg to take care of it. Furthermore, there is no evidence that the errata sheet was ever sent to plaintiffs, and Berg has no recollection of ever discussing the errata sheet with Charles. Since the errata sheet contained information that a reasonable investor would want to know, Charles is not entitled to summary judgment on this element.

■ b) *Scienter:* Charles and Cohen also argue that plaintiffs have failed to show evidence of scienter in making the alleged misstatements. The Supreme Court has defined scienter as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976). The legal definition of scienter also includes recklessness, which the Third Circuit has defined as

> highly unreasonable [conduct], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*McLean v. Alexander*, 599 F.2d 1190, 1197 (3d Cir.1979). In the context of a

projection, forecast or opinion, the scienter requirement is satisfied if the statement in question was made "with reckless disregard for its truth or falsity" or with lack of a "genuine belief that the information disclosed was accurate and complete in all material respects." *Eisenberg v. Gagnon,* 766 F.2d 770, 776; *McLean, supra* at 1198. Negligence, whether gross, grave or inexcusable, cannot serve as a substitute for scienter. *McLean, id.* This definition of scienter applies either to omissions or misstatements. *Id.* at 1197.

A plaintiff in a Rule 10b–5 action "need not produce direct evidence of the defendant's state of mind. Circumstantial evidence may often be the principal, if not the only, means of proving bad faith." *Id.* at 1198. As long as plaintiffs can show a disputed issue of material fact that, despite assertions of good faith, the " 'danger of misleading ... [was] so obvious that the actor must have been aware of it,' " the court will deny defendants' motion. *Id., quoting Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1045 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977). The court also notes that an individual's state of mind is peculiarly a question of fact and credibility best left to the jury.

 Plaintiffs present enough evidence to withstand a summary judgment motion in support of establishing recklessness as to the accuracy and completeness of the tax opinion letter, for example: Charles undertook to issue a tax opinion letter without any expertise or experience in tax or securities law; Charles knew from the outset that Berg was purchasing the building out of bankruptcy because the scope of his engagement included representing Berg's related entities in connection with the purchase and syndication of the property, including attending the bankruptcy auction and closings; Charles knew the tax opinion letter ultimately would be included in the PPM and sent to prospective investors; Charles gave "no thought" to revising his tax opinion to reflect new material information in the errata sheet, even though his tax opinion implied that he would amend it

to reflect any new material facts. Based on the evidence before the court at this time, a jury could find that Charles recklessly disregarded the truth or falsity of certain statements in his tax opinion. 

As to defendant Cohen, plaintiffs allege the following affirmative misstatements: (1) Cohen's statement that "the assumptions and rationale underlying the projected financial statements are reasonable for purposes of the projections"; and (2) Cohen's statement that his review of the data included "tests of the computations, inquiries as to the methods of compiling the data set forth in the projections, discussions with officials of the General Partner and such other procedures as I considered necessary in the circumstances."

Plaintiffs contend, and Cohen has testified, that he never investigated the reasonableness of one of the key assumptions of this specific project—that the property would be purchased for $5.3 million in an agreement not at arm's length. Plaintiffs have submitted an expert's opinion that, if he had made the proper inquiry, "Mr. Cohen should then have issued an adverse opinion in accordance with generally accepted accounting procedures because on[e] or more of the significant assumptions was unreasonable." Radetich Report at 5.

Cohen argues that at the time he issued his forecast letter (July 1980), the facts underlying the assumptions were not in existence and, therefore, he had to opine in general terms so as not to mislead potential investors. Furthermore, his letter also stated that he expressed no opinion on the "fairness" of the projections, thereby limiting his review to the arithmetic soundness of the computations of profit, loss and potential flow of tax deductions. The ultimate economic and tax assumptions upon which the projections were based were left to Berg and Charles.

Although the circumstantial evidence indicating recklessness by Cohen in the review he undertook for Berg is not as substantial as that against Charles, the court believes it is enough to let the jury decide. For example, at the time of the CROBA offering, Cohen was an experienced ac-

countant with close to twenty years of active practice, including five years as Berg's personal accountant. Such work included preparing financial statements and tax returns for Berg's limited partnerships in the FAMCO syndications. Cohen was familiar with tax shelters and the purpose of PPMs in disclosing material information to potential investors, and he knew that his forecast letter would be disseminated as part of the CROBA PPM. He also understood that, in order for non-recourse debt to be includable in basis for tax purposes, the fair market value of the real estate had to equal or exceed the amount of the debt. Yet, though he knew the property was being purchased out of bankruptcy, he did not disclose that fact in concluding that the assumptions were "reasonable," relying instead on a disclaimer in the PPM that it was not an arm's length transaction.

Moreover, Cohen testified that he tested the computations in the projections, made inquiries as to methods of compiling the relevant data and had a two-hour discussion with the general partner, nothing more. Yet he represented in the forecast letter that he also conducted "such other procedures as I considered necessary in the circumstances." A jury could find that this statement was made in reckless disregard of its truth or falsity.

c) *Reliance and Proximate Causation:* Since the Supreme Court narrowed the scope of liability under § 10(b) by imposing a scienter requirement in *Ernst & Ernst v. Hochfelder, supra,* courts have approached the reliance element in a flexible manner in order to serve the twin federal goals of encouraging investor caution while also protecting investors from fraud. "The [plaintiff's] obligation of due care must be a flexible one, dependent upon the circumstances of each case." *Straub v. Vaisman & Co., Inc.,* 540 F.2d 591, 598 (3d Cir.1976). "We require only that the plaintiff act reasonably. Since the failure to meet that standard is in the nature of an affirmative defense, the burden of proof rests upon the defendant." *Id.*

Such matters as fiduciary relationship, opportunity to detect the fraud, sophistication of the plaintiff, the existence of long standing business or personal relationships, and access to the relevant information are all worthy of consideration. *Id.* The *Straub* court also noted that "a sophisticated investor is not barred by reliance upon the honesty of those with whom he deals in the absence of knowledge that the trust is misplaced." *Id.* See *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 79 (2d Cir.1980) ("a plaintiff's burden is simply to negate recklessness when the defendant puts that in issue, not to establish due care.").

Plaintiffs have testified, and defendants fail to controvert, that they relied on the information in the PPM and the opinion letters in evaluating the transaction and would not have made the investment if they knew about the purchase out of bankruptcy, the step-up in price and Berg's role in the transaction. Full disclosure of this material information was necessary to avoid certain statements from being misleading. However, defendants Cohen and Charles assert that plaintiffs acted unreasonably in relying on the PPM and attached opinion letters in the face of numerous disclaimers. These disclaimers concerned the high risks associated with the project, including the possibility of the IRS disallowing the deductions, a possibility that came to pass in 1986. Cohen also points to a statement in his forecast letter that the *projections* depended on the occurrence of the purchase of the property before November 15, 1980. Plaintiffs Gilmore and Liff purchased their interests in early December 1980 and the property was not bought until later in December.

The Cohen disclaimer, however, is irrelevant to Cohen's alleged misstatements that the assumptions and rationale were reasonable and that he conducted other procedures to verify the projections. Similarly, the disclaimers in the tax opinion letter, and more generally in the PPM, did not sufficiently warn investors that the tax opinion would not be updated or that the fair market value of the property would be misleading without the disclosure of addi-

tional information. The court concludes, therefore, that defendants have not shown, as a matter of law, that plaintiffs unreasonably relied on the opinion letters authored by these defendants. As to proximate causation, defendants have failed to present any compelling arguments rebutting plaintiffs' showing that the misstatements in the opinion letters proximately caused their injuries.

d) *Aiding and Abetting Liability:* Defendants, based on a paucity of evidence, urge the court to grant summary judgment dismissing allegations of aiding and abetting liability. Plaintiffs rely on the evidence already presented to support their argument that material facts are in dispute on this issue.

■ To prevail on a claim of aiding and abetting liability under Rule 10b–5, plaintiffs must show (1) that there has been a commission of a wrongful act—an underlying securities violation; (2) that the aider/abettor had knowledge of that act; and (3) that the aider/abettor knowingly and substantially participated in the wrongdoing. *Gould v. American–Hawaiian Steamship Co.,* 535 F.2d 761, 779 (3d Cir. 1976); *Rochez Brothers, Inc. v. Rhoades,* 527 F.2d 880, 886 (3d Cir.1975). A defendant's conduct after the sale of securities could aid and abet a prior sale where there is evidence of substantially assisting in a cover-up. *Rudolph v. Arthur Andersen,* 800 F.2d 1040, 1047 (11th Cir.1986).

■ Cohen argues that since he did not obtain the information about the purchase out of bankruptcy and the artificial step-up until after the sale of securities to plaintiffs, he could not aid and abet the wrongful conduct. There is evidence, however, that Cohen did not inform the limited partners of this information once he learned it, despite his continued involvement with CROBA. This suggests aiding and abetting liability. Summary judgment on these grounds will be denied.

In summary, the court has concluded that the equities inherent in the *Chevron* test compel it to allow plaintiffs' § 10(b) and Rule 10b–5 claims to go forward in these special circumstances. The court finds, however, that no duty to disclose arose on the part of Charles or Cohen as to certain omissions. The remaining alleged affirmative misstatements withstand defendants' motions since, drawing all inferences in favor of plaintiffs, they have shown disputed issues of material fact as to scienter, materiality, reasonable reliance and aiding and abetting liability.

## D. *RICO*

The RICO statute authorizes civil suits by "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c) (1988). Section 1962(a) prohibits "any person who has received any income derived ... from a pattern of racketeering activity" from using that money to acquire, establish or operate any enterprise that affects interstate commerce. Section 1962(b) prohibits any person from acquiring or maintaining an interest in, or controlling any such enterprise "through a pattern of racketeering activity." Section 1962(c) prohibits any person employed by or associated with an enterprise affecting interstate commerce from "conduct[ing] or participat[ing] ... in the conduct of such enterprise's affairs through a pattern of racketeering activity." Finally, section 1962(d) prohibits any person from "conspir[ing] to violate any of the provisions of subsections (a), (b), or (c)." A "pattern of racketeering activity" requires commission of at least two predicate offenses on a specified list. 18 U.S.C.A. §§ 1961(1), (5) (1984 & Supp. 1990).

■ Plaintiffs' amended complaint, counts II through V, allege that "some or all of the defendants" violated each of the four provisions of § 1962. Defendants Charles [8] and Cohen seek summary judg-

---

**8.** Charles seeks a Rule 12(b)(6) dismissal of all four RICO counts for failure to plead fraud with sufficient particularity as required by Rule 9(b), Fed.R.Civ.Pro. Charles complains, *inter alia,*

that the alleged predicate acts of wire and mail fraud do not pinpoint any particular omissions and misstatements by him. The court need not dwell on this argument since it has decided to

ment on each count as a matter of law on grounds that plaintiffs have failed to show facts necessary to establish a RICO cause of action against them. Plaintiffs contend that these defendants' participation in the fraudulent offering of CROBA securities is sufficient to preclude summary judgment.

The court must examine whether the pattern of racketeering activities plaintiffs allege meets the definition enunciated by the Supreme Court in *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). "To prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." 109 S.Ct. at 2900. The Court also suggested that the legislative history on this issue was enlightening: "[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985).

The Supreme Court in *H.J. Inc.* elaborated on the continuity prong of the pattern test, stating, "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." 109 S.Ct. at 2902. The Third Circuit has stated that the court must inquire into the extent of the racketeering activity based on the circumstances of the particular case. *Barticheck v. Fidelity Union Bank/First National State*, 832 F.2d 36 (3d Cir.1987). Above all, the court must take a flexible approach in reaching a determination of whether a pattern exists. *H.J. Inc.*, 109 S.Ct. at 2900.

Furthermore, as the Third Circuit recently noted,

no defendant can be liable under RICO unless he participated in two or more predicate offenses sufficient to constitute a pattern. This participation need not be direct. RICO recognizes liability for those who merely aid and abet the underlying predicate offenses. *Petro-Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349, 1356–58 (3d Cir. 1987). Moreover, a defendant can be liable under RICO's conspiracy provision for agreeing to the commission of a pattern of racketeering activity, even if that defendant does not directly participate in the underlying acts. *United States v. Adams*, 759 F.2d 1099, 1116 (3d Cir.), *cert. denied*, 474 U.S. 906, 971, 106 S.Ct. 275, 336, 88 L.Ed.2d 236 (1985).

*Banks v. Wolk*, 918 F.2d 418, 421 (3rd Cir.1990).

In determining whether plaintiffs have sufficiently proven, for purposes of this summary judgment motion, that these defendants participated in a pattern of racketeering activity, the court must determine that each defendant meets the separate requirements of relatedness and continuity. *Id.*, at 422.

■ As earlier explained, Charles and Cohen were involved in the alleged fraudulent scheme by their preparation of opinion letters attached to the PPM. These letters were disseminated by Berg to an unspecified number of prospective investors, including the twenty-nine individuals who actually purchased CROBA securities. Charles' alleged participation in the scheme appears to have lasted from May 1980 until January 1981 while Cohen's persisted from June 1980 until at least 1984, when he stopped preparing tax returns and other financial information for the partnership, which allegedly furthered the fraud by concealing pertinent facts and developments. Plaintiffs' Amended Complaint at ¶ 55. Although plaintiffs allege other schemes in-

deny summary judgment on the securities fraud claims alleged against Charles and Cohen. Securities fraud is a predicate act under the RICO statute. 18 U.S.C. § 1961(1)(D). Defendants cannot seriously argue that they have not been put "on notice of the precise misconduct with

which they are charged." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir.1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). Therefore, the court will deny Charles' motion to dismiss the RICO counts.

volving Berg, Green and Tucker, Charles and Cohen were alleged to be involved only in the single offering of CROBA securities.

Defendants urge the court to conclude that their involvement does not meet the test of continuity, specifically participation in a closed-end scheme over a substantial period of time. However, when plaintiffs have shown a scheme involving the repetition of similar misrepresentations to multiple victims over a relatively short period of time, courts in this circuit have ruled that the pattern element has been met. *See Barticheck*, 832 F.2d at 39 (misrepresentations made to twenty-three investors in a failed limited partnership); *Saporito v. Combustion Engineering, Inc.*, 843 F.2d 666 (3d Cir.1988), *vacated and remanded on other grounds*, 489 U.S. 1049, 109 S.Ct. 1306, 103 L.Ed.2d 576 (1989) (multiple inducements to retire made to thirty-two retirees over roughly six months); *Bloch v. Prudential–Bache Securities*, 707 F.Supp. 189, 195 (W.D.Pa.1989) (similar misrepresentations to ten investors over several years); *see also, Keystone Insurance Company v. Houghton*, 863 F.2d 1125, 1132 (3d Cir.1988) (reaffirming *Barticheck* that repetition of similar misrepresentations to more than twenty investors was "most significant" factor). The presence of this factor distinguishes this case from *Banks* and *Marshall–Silver Construction Company v. Mendel, et al.*, 835 F.2d 63 (3d Cir.1987), where the single fraudulent scheme involved only one victim of racketeering activity and thus no pattern was found.

Having concluded that the pattern element has been met, the court must determine whether remaining contested elements are met for each RICO count. As to both Charles and Cohen, plaintiffs have not alleged, nor do they argue in their briefs, that these specific defendants violated § 1962(a) or § 1962(b). The court agrees with defendants that there is no evidence that Cohen or Charles invested the proceeds of racketeering activity to acquire the named RICO "enterprises" (COBRA, AREA, MCR and OBCR) or that they acquired control of such enterprises through racketeering activity. Therefore, the court will grant summary judgment in favor of Charles and Cohen on counts II and III.

The remaining arguments submitted by defendants in favor of granting summary judgment on plaintiffs' §§ 1962(c) and 1962(d) claims fail for virtually the same reasons they failed in the context of the § 10(b) claims. See the court's discussion of scienter and aiding/abetting liability, *supra*. There is sufficient evidence to let the jury decide whether these defendants knowingly or recklessly participated in the conduct of the RICO enterprises' affairs through a pattern of racketeering activity and whether such participation was effected by means of a conspiracy among the defendants. Furthermore, the court finds Charles' arguments of RICO unconstitutionality as applied to him unpersuasive.

Count XII of plaintiffs' amended complaint alleges violations of sections 2C:41–2 of the New Jersey Code of Criminal Justice, otherwise known as the New Jersey RICO statute. Although there is little guidance from New Jersey state courts in interpreting the statute, the legislative history indicates that it was modeled after the federal RICO statute, and courts have interpreted its provisions no differently. *See, e.g., Environmental Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052, 1064 (3d Cir.1988), *cert. granted in part*, 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 563 (June 26, 1989). This court, and the parties, see no reason to depart from this principle. Therefore, summary judgment will be granted as to 2C N.J.S.A. 41–2 a and 41–2 b and denied as to 2C N.J.S.A. 41–2 c and 41–2 d.

### E. *New Jersey Consumer Fraud Act*

Defendants Charles and Cohen seek judgment as a matter of law on Count VI of plaintiffs' complaint, which alleges violations of the New Jersey Consumer Fraud Act, 56 N.J.S.A. 8–2. The court has already concluded that, since the complaint "contains facts alleging fraud in the sale of real estate in addition to securities fraud," the claim should remain, citing *Arroyo v.*

*Arnold Baker and Assoc. Inc.*, 206 N.J.Super. 294–97, 502 A.2d 106 (Law Div.1985). *Gilmore v. Berg*, No. 86–4694 (June 24, 1987), slip op. at 15. Defendants have failed to present any New Jersey case law to undermine the *Arroyo* decision or to persuade the court otherwise. The motion will be denied.

### F. *Breach of Fiduciary Duty and Mismanagement:*

■ Count XIII of plaintiffs' complaint alleges that defendants Cooper River, AREA, Berg "and those other defendants charged with the responsibility of managing the affairs of Cooper River," violated their fiduciary duties to plaintiffs. The court has already concluded that Cohen and Charles had no duty to disclose certain omitted facts to these plaintiffs. It reaches the same conclusion here, particularly since plaintiffs have failed to show how Cohen and Charles were in any way responsible for managing the affairs of Cooper River. Therefore, Count XIII will be dismissed against Cohen and Charles.

### CONCLUSION

For the reasons set forth above, the court will allow plaintiffs to move forward with their federal securities fraud claims. Such claims are timely and there are sufficient facts to let the jury decide whether these defendants acted with recklessness in making certain statements in their respective opinion letters. The court will dismiss Counts II and III of the complaint alleging violations of RICO §§ 1962(a) and (b), as well as its state law counterparts, while retaining Counts IV and V as triable issues for the jury. Finally, Count XIII will be dismissed against Cohen and Charles.

An appropriate order will be entered.

### ORDER

This matter having come before the court on the motions to stay, to dismiss and for summary judgment filed by defendants Pat Charles, Charles, Sturm & Masters and Norman Cohen, and joined in by defendants Tucker and Green; and

The court having considered the submissions of the parties and having heard oral argument; and

For the reasons set forth in the opinion accompanying this order;

IT IS this 3rd day of April, 1991 hereby

ORDERED that the motion to stay is DENIED; and further

ORDERED that the motion to dismiss Count I as time-barred is DENIED WITH PREJUDICE; and further

ORDERED that the motion to dismiss Counts I–V and XI for failure to state a cause of action is DENIED WITH PREJUDICE; and further

ORDERED that the motion for summary judgment on Count I is DENIED WITH PREJUDICE; and further

ORDERED that the motion for summary judgment on Counts II and III, relevant parts of Count XII and all of Count XIII is GRANTED WITH PREJUDICE as to Cohen and Charles; and further

ORDERED that the motion for summary judgment on Counts IV, V, VI, VIII, IX, X and XI, and remaining portions of Count XII is DENIED WITH PREJUDICE.