Robert J. GILMORE and
Noah Liff, Plaintiffs

v.

John Gordon BERG, Harold M. Winton, Stephen T. Marcoe, Jr., Rosalind Schneider, Martin R. Barker, Howard Green, Gilbert Tucker, Cooper River Office Building Associates, American Real Estate Associates, Inc., Management of Cooper River, Inc., Office Buildings of Cooper River, Inc., Pat Charles, Charles, Sturm & Master and Norman S. Cohen, Defendants.

Civ. No. 86–4694(SSB).

United States District Court,
D. New Jersey.

April 26, 1993.

---

Howard Kaufman, Steven Coren, Peter J. Weidman, Kaufman, Coren & Ress, Philadelphia, PA, Manya Kamerling, Haddonfield, NJ, for plaintiffs.

Ronald M. Katkocin, Markwardt & Katkocin, P.C., Marlton, NJ, for defendants Pat Charles, Charles, Sturm & Master.

Frank A. Luchak, James J. Ferrelli, Duane, Morris & Heckscher, Marlton, NJ, for defendant Norman S. Cohen.

1. Pat Charles died on November 2, 1991. His estate has been substituted as a party defendant. For the purposes of this opinion, the Court will

BROTMAN, District Judge:

Presently before the Court are the motions for summary judgment of Defendants Pat Charles[1] and Charles, Sturm & Master (hereinafter "Charles"), and of Defendant Norman Cohen. For the reasons set forth below, Defendants' motions are granted in part and denied in part.

## FACTS AND PROCEDURAL BACKGROUND

The facts and procedural background of this case are exhaustively described in two published opinions of this Court. *See Gilmore v. Berg,* 807 F.Supp. 1176 (D.N.J.1992); *Gilmore v. Berg,* 761 F.Supp. 358 (D.N.J. 1991). Set forth below are the facts and background relevant to the motions presently before the Court.

In December 1980 Plaintiffs purchased unregistered securities in Cooper River Office Building Associates ("CROBA"), a New Jersey limited partnership. The information regarding the limited partnership was contained in a private placement memorandum dated September 19, 1980. Plaintiffs allege that on December 13, 1980, Office Buildings of Cooper River, Inc. ("OBCR"), a Nevada corporation owned by John Berg (50 percent), Howard Green (25 percent), and Gilbert Tucker (25 percent), paid a bankrupt entity in Camden, New Jersey $2,500,000 for two commercial office buildings and the land on which they stand. On the same day, OBCR sold the two buildings for $4,770,000 and leased the underlying land for a seventeen-year term to Management of Cooper River, Inc. ("MCR"). Also on that same day, MCR sold the two buildings and assigned the lease for $5,300,000 to CROBA, the general partner of which was American Real Estate Associates, Inc. ("AREA"). MCR is a wholly-owned subsidiary of AREA, a company controlled by Berg.

Plaintiffs claim that the December 13, 1980 transactions constituted an illegal scheme concocted to impair the value of their investment. Specifically, Plaintiffs complain that the private placement memorandum failed to

continue to refer to this defendant as Pat Charles.

disclose the "step-up" in the purchase price of the two buildings—that is, the difference between the $2,500,000 paid for the buildings by OBCR and the $5,300,000 ultimately paid by CROBA. Plaintiffs contend that the alleged scheme diminished the likelihood they would realize desired profits and appreciation, caused an inflated basis on the property for federal income tax purposes, and misled them into believing they would be afforded substantial depreciation and interest deductions.

The facts relevant to the present motions involve the roles played by Charles, an attorney who prepared a tax opinion letter, and Cohen, an accountant who prepared a report on the projected financial performance of the partnership. Both documents were attached to the private placement memorandum, which referred to Charles and Cohen as "experts."

Berg communicated with Charles in April 1980 and retained him to represent AREA in connection with the purchase in the bankruptcy court of the office buildings and land. In May 1980 Berg informed Charles that if the purchase was successful, Berg intended to syndicate the property. Berg asked Charles to prepare a tax opinion letter for AREA to use in syndicating the property. He gave Charles a draft letter that he claimed he and a tax attorney had drafted. Berg asked Charles to review the letter and the proposed private placement memorandum. Charles reviewed the letter, conducted legal research, revised the letter, and agreed to sign it as revised. Berg and Charles agreed on the revised letter on June 13, 1980, and Berg put it on Charles's stationary. The letter states that the purchase price of $5.3 million reflects the fair market value of the property as determined by AREA, and that the opinion would be amended to reflect any variation between information in the memorandum and later developed facts.

Several weeks later Berg told Charles that he would not request Charles to sign the letter and would not send it to proposed investors until after the closing of title on the property. In fact, Berg in July 1980 actively started soliciting limited partners through the private placement memorandum, which included Charles's tax opinion letter. Sometime prior to December 1980, Charles learned that Berg was selling interests in the syndication. Charles claims, however, that he was unaware his tax opinion letter was part of the private placement memorandum.

Around this same time, Charles helped obtain bankruptcy court approval of the proposed AREA purchase and prepared the documentation necessary to close title. The closing took place at two meetings, on December 15, 1980 and January 13, 1981. Charles and Berg had agreed on a flat fee of $9,000, plus costs, for all of Charles's legal services. The fee was paid in full at the final closing. Two weeks later, at Berg's request, Charles executed the tax opinion letter and sent it to Berg. Thereafter, Charles provided limited legal services to Berg and his controlled entities.

An important event during the syndication of CROBA was the preparation of a draft "errata" sheet that was meant to inform prospective investors of, *inter alia*, (1) the purchase out of bankruptcy for $2,500,000, (2) Berg's full role in the transaction, and (3) the step-up in price from $2.5 million to $5.3 million. Charles received the errata sheet sometime in November 1980 and was told by Berg not to worry about it. Plaintiffs claim that they never received the errata sheet and, therefore, that they never knew these material facts before purchasing their interest in CROBA.

As for Cohen, Berg retained him in June 1980 to review a set of financial projections for the limited partnership and to prepare and sign a forecast letter to be included in the private placement memorandum. Berg gave Cohen a set of projections, assumptions on which the projections were based, and a draft forecast letter. In July 1980 Cohen prepared the forecast letter and delivered it to Berg for inclusion in the private placement memorandum. The language of the letter on which Plaintiffs stake their claims against Cohen reads:

My review [of AREA's projections and assumptions] included tests of the computations, inquiries as to the methods of compiling the data set forth in the projections, discussions with officials of the General

Partner [AREA] and such other procedures as I considered necessary in the circumstances. No other verification procedures were applied. I believe that the assumptions and rationale underlying the projected financial statements are reasonable for the purposes of these projections. Since the projections are based on assumptions, the reliability of which is dependent on future events and transactions, as an independent accountant, I do not express an opinion on the fairness of these projections.

Cohen's work on the letter was limited to one meeting with Berg and several hours performing computations. For his services, Cohen was paid a flat fee of $3,000.

Plaintiffs commenced this action in November 1986, claiming that as a result of the alleged fraudulent misrepresentations and omissions, they lost profits, lost tax deductions and credits, and incurred substantial interest and penalties. Plaintiffs sought relief under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5, promulgated thereunder; subsections 1962(a)–(d) of the Racketeer Influenced and Corrupt Organizations ("RICO") provisions of the Organized Crime Control Act of 1970, 18 U.S.C. §§ 1961–1968; and numerous state common law and statutory provisions.

After substantial motion practice, several of Plaintiffs' claims have been dismissed. Plaintiffs' remaining claims under federal law against Charles and Cohen include alleged violations of subsections 1962(c) and 1962(d) of the RICO provisions. The racketeering activity in which Plaintiffs allege Defendants engaged is securities fraud.[2] Specifically, Plaintiffs allege that Charles violated § 10(b) and Rule 10b–5. They claim that Charles made affirmative misrepresentations in his tax opinion letter by stating that the $5.3 million paid for the property by CROBA reflected the property's fair market value, and by failing to update the letter after he received the errata sheet even though the letter stated that it would be updated to reflect any variation between information in the memorandum and later developed facts. *See Gilmore v. Berg,* 761 F.Supp. 358, 369–70 (D.N.J.1991). Similarly, Plaintiffs claim that Cohen made affirmative misrepresentations in his forecast letter. They assert that his statement that "the assumptions and rationale underlying the projected financial statements are reasonable" is untrue because one of the key elements of the transaction—the $5.3 million purchase of the property—made the failure to issue an adverse opinion unreasonable. *Id.* at 371.

DISCUSSION

*The § 1962(c) RICO Claims*

■ Defendants seek to dismiss Plaintiffs' claims under § 1962(c). Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Resolving a conflict among the Circuit Courts of Appeal, the Supreme Court recently held that a person violates § 1962(c) only if that person "participates in the operation or management of the enterprise itself." *Reves v. Ernst & Young,* —— U.S. ——, ——, 113 S.Ct. 1163, 1172–74, 122 L.Ed.2d 525 (1993). In reaching its conclusion, the Court looked to the language of § 1962(c) and reasoned that, as a verb, "conduct" means to lead, run, manage, or direct. *Id.* —— U.S. at 4209, ——, 113 S.Ct. at 1168–70. Consequently, liability under § 1962(c) may not be imposed on one who merely "carries on" or "participates" in an enterprise's affairs. *Id.* Rather, "one must have some part in directing those affairs." *Id.*

Defendants argue that their conduct fails to satisfy the degree of direction required by *Reves.* This Court agrees. The preparation by Charles and Cohen of the allegedly misleading opinion and forecast letters merely constituted the rendition of professional services to Berg and the corporate entities he controlled. Such conduct does not constitute participation in the direction of the affairs of

---

**2.** Plaintiffs also appear to allege that Defendants engaged in mail fraud and wire fraud under 18 U.S.C. §§ 1341, 1343. However, Plaintiffs have failed to plead or otherwise specify any actions or omissions by Charles or Cohen that would constitute mail or wire fraud. *See Gilmore v. Berg,* 761 F.Supp. 358, 373–74 n. 8 (D.N.J.1991).

any of the corporate entities involved in the syndication or sale of interests in CROBA. *See, e.g., Midwest Fed. Sav. & Loan Ass'n v. Greentree Acceptance, Inc.*, No. 88–0669, 1989 U.S.Dist. LEXIS 17768, at *27 (D.Minn. August 17, 1989). As this Court has already noted, Plaintiffs present no evidence that Charles or Cohen played any role in initiating or formulating the process of syndication. *See Gilmore v. Berg*, 761 F.Supp. 358, 369 (D.N.J.1991).

Plaintiffs make several arguments in opposition to Defendants' motions. First, Plaintiffs seek to enlarge the degree of direction exercised by Charles by contending that the enterprise in whose management he participated has been defined too narrowly. Although in their amended complaint, Plaintiffs allege that the relevant enterprises are CROBA, AREA, MCR, and OBCR or, in the alternative, that those entities are associated in fact as a single enterprise, Am.Compl. ¶ 62, Plaintiffs now, for the first time, assert that "[p]roperly understood ... the enterprise is the *syndication* of the Cooper River Office Buildings by and through Berg and the various entities he controlled." . Pls.' Mem. Opp'n Summ. J. at 15–16 (emphasis in original). Plaintiffs appear to use the term "syndication" to mean the transactions related to and including the sale of interests in CROBA.

■ Plaintiffs' definition of enterprise is untenable. It confuses the enterprise with the activities of the enterprise. Legal transactions, such as the purchase of property or the sale of interests in a limited partnership, cannot constitute a RICO enterprise. *See Madara v. Singular Music Publishing Co.*, No. 84–0006, 1987 WL 10115, at *4, 1987 U.S.Dist. LEXIS 3348, at *10–*11 (E.D.Pa. April 24, 1987); *In re Catantella and E.F. Hutton & Co. Sec. Litig.*, 583 F.Supp. 1388, 1426 (E.D.Pa.1984).

Plaintiffs also seek to demonstrate Charles's direction by attempting to show that he was "intimately involved in virtually every aspect of the syndication." Pls.' Mem.

Opp'n Summ. J. at 16. Plaintiffs claim that in addition to preparing the tax opinion letter, Charles prepared documents and bid on behalf of Berg for the purchase out of bankruptcy of the real estate, attended closings for the purchase of the real estate, prepared and filed the Certificate of Limited Partnership for CROBA and the Certificate of Incorporation of MCR, and served as agent for the receipt of process for the corporate entities.

■ As an initial matter, it is questionable whether these allegations are relevant. Under § 1962(c) a person employed by or associated with an enterprise is liable only if he participates in the operation or management of the enterprise *through a pattern of racketeering activity*. Aside from the alleged misrepresentations Charles made in the tax opinion letter, which might constitute fraud in the sale of securities, it is unclear how any of the activities in which Plaintiffs claim Charles engaged constitute securities, mail, or wire fraud.

In any event, Plaintiffs argument is more fundamentally flawed, for none of the activities in which Charles allegedly engaged suggest that he participated in directing the affairs of CROBA, AREA, MCR, or OBCR, either separately or collectively. Preparing documents for the purchase and sale of real estate, attending closings, preparing and filing Certificates of Limited Partnership and Incorporation, and serving as agent for the receipt of process for legal entities—these are all common professional services typically rendered by attorneys for their business clients. There is no evidence that Charles was directing the legal entities he represented to engage in particular transactions. He merely provided tangential legal services to aid those entities in carrying out transactions directed by Berg. Because Charles's conduct did not constitute participation in the management or operation of a RICO enterprise, Plaintiffs' claim against him under § 1962(c) must be dismissed.[3]

---

**3.** Similarly, Plaintiffs claim that Cohen not only prepared the allegedly misleading forecast letter, but also provided accounting services for the Berg-controlled entities involved in the sale of interests in CROBA. Assuming these allegations are true, they fail to demonstrate that Cohen participated in the management or operation of a RICO enterprise.

*The § 1962(d) RICO Claims*

■ Defendants also seek the dismissal of Plaintiffs' claims against them under § 1962(d). Section 1962(d) makes it unlawful to conspire to violate § 1962(c). A plaintiff whose allegations fail to make out a claim under § 1962(a), (b), or (c) cannot maintain a claim under § 1962(d). *See Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1411 n. 1 (3d Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991); *Schwartz v. Philadelphia Nat'l Bank,* 701 F.Supp. 92, 96 (E.D.Pa.1988), *aff'd,* 879 F.2d 859 (3d Cir.1989). Accordingly, Plaintiffs claims against Defendants under § 1962(d) are dismissed.

*The State Law Claims*

■ Finally, Defendants seek the dismissal of Plaintiffs' pendent state law claims. They argue that because the Court has before trial dismissed all Plaintiff's federal claims against Defendants, it should refuse to exercise pendent jurisdiction over Plaintiffs' state law claims. However, in its discretion this Court may retain jurisdiction over Plaintiffs' state law claims. *See Lentino v. Fringe Employee Plans, Inc.,* 611 F.2d 474, 480 (3d Cir.1979). Because this case has consumed more than six years of pretrial proceedings, the Court concludes that it would be inappropriate at this late date to dismiss Plaintiffs' pendent claims.