Jerry ACKERMAN, et al.,
Plaintiffs–Appellants,

v.

Howard K. SCHWARTZ and Bassey,
Selesko and Couzens P.C.,
Defendants–Appellees.

No. 91–1794.

United States Court of Appeals,
Seventh Circuit.

Submitted Aug. 9, 1991.*

Decided Nov. 14, 1991.

---

* Oral argument in a prior appeal, No. 90–1493, took place on December 11, 1990. On January 2, 1991, the court dismissed that appeal for want of jurisdiction, because the district court's order invoking Fed.R.Civ.P. 54(b) did not specify which claims were finally resolved. 922 F.2d 843. The order provided that any further proceedings would return to this panel. After the district court entered a fresh, and complete, judgment under Fed.R.Civ.P. 54(b), accompanied by an explanation why the claims covered by the judgment are distinct from those retained for future decision, see *Buckley v. Fitzsimmons,* 919 F.2d 1230, 1237–38 (7th Cir.1990); *Olympia Hotels Corp. v. Johnson Wax Development Corp.,* 908 F.2d 1363, 1366 (7th Cir.1990), the plaintiffs filed a new notice of appeal. Both sides agreed to use the original briefs, and there is no point to a second oral argument. Plaintiffs have filed a motion to certify a question to the Supreme Court of Indiana. This motion, first made after oral argument on the merits of the appeal, is denied as belated. The case is ready for decision on the merits.

Robert W. Mysliwiec, Jones, Obenchain, Ford, Pankow & Lewis, South Bend, Ind., for plaintiffs-appellants.

Paul E. Becher, J. Scott Troeger, Barnes & Thornburg, Elkhart, Ind., William J. Reinke, Ernest J. Szarwark, Barnes & Thornburg, South Bend, Ind., for defendants-appellees.

Before COFFEY, EASTERBROOK, and RIPPLE, Circuit Judges.

EASTERBROOK, Circuit Judge.

In 1983 and 1984 Gary Van Waeyenberghe and Carl Leibowitz promoted a tax shelter: each $10,000 invested would produce an immediate tax credit of $20,000, a deduction of $10,000, and the opportunity to reap profits from an ethanol manufacturing business. Like most opportunities too good to be true, this was too good to be true—although that did not stop more than 100 persons from taking the bait. The IRS

disallowed the deductions and credits while tacking on interest and penalties. To make matters worse, Van Waeyenberghe and Leibowitz siphoned off the cash. Both pleaded guilty to tax and securities crimes; Leibowitz also was convicted of hiring a hit man to dispose of Van Waeyenberghe, after he concluded that Van Waeyenberghe might sing to the authorities. *United States v. Leibowitz*, 857 F.2d 373 (7th Cir. 1988), 919 F.2d 482 (7th Cir.1990).

It was a fiasco. The money is gone; Van Waeyenberghe and Leibowitz are in prison. The investors turned to the most convenient solvent party—Howard Schwartz, who wrote an opinion saying that taxpayers were entitled under the Internal Revenue Code to the credits and deductions Van Waeyenberghe and Leibowitz touted. (Schwartz's law firm is the other defendant, and we suppose the firm's insurer also takes keen interest; for simplicity we refer only to Schwartz.)

The offering circular promised that the investors' money would be used to lease equipment to manufacture ethanol for use as fuel. Multi–Equipment Leasing Corp. (MEL) would receive money (designated as "rental") and order equipment from Good–Wrench Industries, which was to subcontract the work to S & H Manufacturing Company. According to the offering documents, each $10,000 of prepaid rent would lead MEL to purchase equipment with a market value of $100,000; after using the cash for a down payment, MEL would issue its 14–year note for the balance. MEL would sublease the equipment on the investors' behalf to Organized Producers Energy Corp. (OPEC), which would make ethanol. OPEC promised to pay as rental a portion of its profits, which MEL would pass on to the investors after deducting the balance of the purchase price owed to Good–Wrench. OPEC was to put the equipment in service by the end of 1983; the documents asserted that the investors would be entitled to the investment tax credit on the $100,000 purchase price and to amortize the rentals as ordinary and necessary business expenses. Were all this done at arms' length and real prices, the tax angle would be implausible enough.

But it was not done at arms' length; Leibowitz and Van Waeyenberghe controlled all four firms directly or indirectly. It was not done at market prices; the stills, burners, and related equipment said to have a market value of $100,000 were worth some $5,000. In the end, it was not done at all; Leibowitz, Van Waeyenberghe, and a few confederates skedaddled with the money.

Schwartz gave the promoters an opinion letter reciting "facts" that made this venture look legitimate—that the four corporations were unaffiliated, that the equipment would be sold at market price, that all of the equipment would be placed in service by the end of 1983, and so on—and concluding that the IRS would be unable to deny investors the $20,000 credit and $10,000 deduction per $10,000 unit of investment. The "facts" so recited were fictions. Schwartz says that he told Robert Clemente, an associate at the law firm, to conduct the due diligence inquiry. Clemente recalls things differently, testifying at his deposition that Schwartz said he would check the facts personally. Whether the lack of inquiry was attributable to an Alfonse-and-Gaston routine or to utter indifference to the truth, there was no verification. The letter says that the law firm examined documents "as we deem relevant" and relied on unnamed persons for unspecified facts. Although it added that "[w]e have not made an attempt to independently verify the various representations", the letter also said that it was prepared "in a manner that ... complies with the requirements of both the proposed Treasury Regulations [Treas.Reg. 230] and [the ABA's] Formal Opinion 346". Both Regulation 230 and Opinion 346 require a lawyer to verify questionable assertions by the promoters. Assertions that every piece of equipment in an ethanol manufacturing business has a market value of precisely $100,000, that the transactions among four shell corporations were at arms' length, and that equipment that could not be ordered until late 1983 (counsel's letter is dated August 30, 1983, and the money-raising lay ahead) would be placed in service by the end of December 1983, carry

warning signals—especially considering that one of the promoters, Leibowitz, was a disbarred lawyer—so a reader of the letter might well infer that the law firm had inquired independently.[†] The letter explained that under Opinion 346 the author of a tax opinion must "make inquiry as to all relevant facts, be satisfied the material facts are accurately and completely described in the offering materials, and assure that any representations as to future activities are clearly identified, reasonable and complete", so the reader would not have to be a connoisseur of the ABA's ethics opinions to get the point.

The complaint initiating this lawsuit on behalf of 106 bilked investors is considerably longer than Schwartz's opinion letter but no better thought out. Despite amendments it is packed with implausible assertions and references to inapplicable statutes. The district court sliced off claims based on Indiana's securities law, and state and federal versions of RICO, in a thoughtful opinion. 733 F.Supp. 1231, 1251–56 (N.D.Ind.1989). We see no need to add to the district court's discussion of these issues. The district court also granted summary judgment to Schwartz on claims under the federal securities laws and state malpractice law—limited to the 1983 tax shelter. *Id.* at 1240–51. By the time Schwartz wrote a comfort letter concerning the 1984 program, the district court believed, he may have had actual knowledge of the falsity of the representations and may have become involved as a co-venturer. (Evidence in the record suggests that MEL invested in a partnership of which Schwartz was a general partner.) The district judge concluded that Schwartz could not be liable under the federal securities laws because he was not a "seller" (excluding liability under § 12 of the Securities Act of 1933, 15 U.S.C. § 77*l*) and because

he did not have the mental state necessary for liability under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the SEC's Rule 10b–5, 17 C.F.R. § 240.-10b–5. The malpractice claim foundered, the district court held, because Schwartz owed no duty to the investors. We turn first to plaintiffs' claims under § 12.

## I

■ Section 12 creates a remedy against any person (1) who "offers or sells a security in violation of section 5" (that is, sells a security that should have been registered but was not) or (2) who "offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact". A person who violates either § 12(1) or § 12(2) "shall be liable to the person purchasing such security from him" under a rescissionary standard. *Pinter v. Dahl*, 486 U.S. 622, 641–54, 108 S.Ct. 2063, 2075–83, 100 L.Ed.2d 658 (1988), holds that although § 12(1) reaches "sellers" who do not stand in a relation of privity to the purchaser, it does not reach persons such as attorneys who facilitated the sale but were not statutory "sellers". That holding dooms the plaintiffs' efforts to hold Schwartz liable under § 12.

Although the investors maintain that Schwartz is amenable to liability under § 12(2) even if not under § 12(1), the statute does not permit such differentiation. Both § 12(1) and § 12(2) identify the person who "offers or sells a security" as the one potentially liable. "Offer" and "sell" are defined terms in the '33 Act (see § 2(3)) and cannot mean one thing in § 12(1) and something else in § 12(2). "Clearly the word [sell] has the same meaning in subdivision (2) as in subdivision (1) of section 12." *Schillner v. H. Vaughan Clarke & Co.,*

[†] ABA Formal Opinion 346 provides in part: "[W]here essential underlying information, such as an appraisal or financial projection, makes little common sense, or where the reputation or expertise of the person who has prepared the appraisal or projection is dubious, further inquiry clearly is required. Indeed, failure to make further inquiry may result in a false opinion [which violates the disciplinary standards]."

Summing up, Formal Opinion 346 states that a lawyer must "[m]ake inquiry as to the relevant facts and, consistent with the standards developed in ABA Formal Opinion 335, be satisfied that the material facts are accurately and completely stated in the offering materials, and that the representations as to intended future activities are clearly identified, reasonable and complete."

134 F.2d 875, 878 (2d Cir.1943). Moreover, only "the person purchasing such security from" a seller may use § 12; this language, which the Court emphasized in *Pinter*, applies to both subsection (1) and subsection (2). Under *Pinter* a lawyer is not a seller, and the investor is not "the person purchasing such security from" a lawyer. 486 U.S. at 651 & n. 27, 108 S.Ct. at 2081 & n. 27. Plaintiffs' theory that Schwartz is a seller because his opinion letter played an important role in making the units marketable is just another version of the proposition that § 12 covers anyone whose participation is a "substantial factor" leading to the transaction. *Pinter* considered and rejected, *id.* at 648–54, 108 S.Ct. at 2079–82, the "substantial factor" approach to liability under § 12.

If the language of § 12 left any doubt, the structure of the '33 Act would resolve it. Section 12 must be understood as a partner to § 11. *Pinter*, 486 U.S. at 650 n. 26, 108 S.Ct. at 2080 n. 26. Section 11 creates liability for the issuer, underwriter, and anyone who signs a registration statement containing a materially false or misleading statement. Everyone except the issuer has statutory defenses: persons who conduct a "reasonable investigation", § 11(b)(3)(A) (the "due diligence" defense), or who rely on the opinion of an expert, § 11(b)(3)(B), may escape liability; persons held liable may attempt to show that their wrongs did not cause the investors' loss, § 11(e), and may obtain contribution from more culpable parties, § 11(f). Section 12 treats the issuer and sellers more harshly. Gone are the due diligence and expertise defenses. Missing is any reference to causation and contribution. If courts read "seller" and "person purchasing such security from him" in § 12 broadly, all of the limitations and defenses in § 11 would vanish, for investors always would use § 12. In limiting the scope of § 12 in a way that excludes attorneys who furnish advice, we honor the decision of Congress to give such persons a set of defenses.

█ Our investors try to escape this conclusion by contending that Schwartz, if not liable as a principal, is at least answerable as an aider and abettor. Yet this approach, no less than an expansive reading of § 12 itself, would destroy the limitations built into the '33 Act. "[N]otions of aiding and abetting liability would be inconsistent with the intent and language of the statutory provision which expressly limits to offerors and sellers the categories of persons who may be sued." *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 942 (7th Cir.1989). Section 15 of the '33 Act provides that persons who directly or indirectly "control[ ] any person liable under section 11 or 12" shall be liable to the same extent as the controlled person. It would upset this decision, as well as the interaction between § 11 and § 12, to add persons such as attorneys to the list. Plaintiffs do not contend that Schwartz controlled MEL; that is that.

Plaintiffs take comfort in the concluding sentence of this section of *Schlifke:* "[W]e see no reason *at this time* to imply a right of action for aiding and abetting under section 12(2)." 866 F.2d at 942 (emphasis added). Our court was not reserving for the future a possibility that it rejected explicitly earlier in the same paragraph; words such as "at this time" in judicial opinions carry the message that judges resolve no more than they consider. New arguments, like new developments in Congress or the Supreme Court, receive fresh consideration. Until then, however, a subject fully considered is closed. Plaintiffs have no new arguments, and we therefore stand with *Schlifke* in holding that there is no liability for aiding or abetting a violation of § 12. Accord, *Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124 (2d Cir.1989); *In re Craftmatic Securities Litigation*, 890 F.2d 628, 634–37 (3d Cir. 1989); Thomas Lee Hazen, 1 *The Law of Securities Regulation* 354–56 (2d ed. 1990).

## II

The district court characterized the investors' claim under § 10(b) and Rule 10b–5 as another species of vicarious liability. Several of our opinions say that to be liable as an aider or abettor under the '34 Act, the defendant must act with the mental state required for primary liability, must violate

a duty to investors established by state law, and also must perform acts that promote the underlying scheme. E.g., *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 495–97 (7th Cir.1986); *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 932–33 (7th Cir.1988); *Schlifke*, 866 F.2d at 946–48. The district court concluded that Schwartz lacked the necessary mental state—not so much because a jury would be bound to conclude that Schwartz was negligent rather than reckless, but because Schwartz's duty ran only to the promoters, to whom the letter was addressed. As the promoters knew the truth, the representations in the letter could not deceive them. "That which might be grossly reckless in a letter destined for investors ... might be nothing more than negligence in a letter destined only for the client." 733 F.Supp. at 1250. In the end, the court held, "[t]he investors have proceeded no further than did the plaintiffs in *Barker*. They have presented nothing to support the inference that Mr. Schwartz or his firm knew, when they issued the opinion letter, of a strong likelihood that MEL, Leibowitz, or VanWaeyenberghe would distribute the letter to potential investors." *Id.* at 1251.

■ In focusing on the distribution of the letter, the district court hinted at a more fundamental question: whether Schwartz had a duty to the investors. Federal law requires persons to tell the truth about material facts once they commence speaking, but with rare exceptions does not oblige them to start speaking. The duty to speak comes from a fiduciary relation established by state law. *Dirks v. SEC*, 463 U.S. 646, 658, 103 S.Ct. 3255, 3263, 77 L.Ed.2d 911 (1983); *Chiarella v. United States*, 445 U.S. 222, 228, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980); *Schatz v. Rosenberg*, 943 F.2d 485 (4th Cir.1991); *Barker*, 797 F.2d at 496. The district judge treats Schwartz as a silent participant in the transactions, and liability of silent persons depends on state law, to which we turn.

■ Indiana follows *Ultramares Corp. v. Touche, Niven & Co.*, 255 N.Y. 170, 174

N.E. 441 (1931) (Cardozo, J.), in limiting the liability of accountants, lawyers, and other professionals when persons receive their reports and opinions second-hand. See *Essex v. Ryan*, 446 N.E.2d 368 (Ind.App. 1983). (The district court concluded that Indiana rather than Michigan law applies, 733 F.Supp. at 1240–41, and we agree with this assessment.) We concluded in *Toro Co. v. Krouse, Kern & Co.*, 827 F.2d 155, 161–62 (7th Cir.1987), that as an *Ultramares* jurisdiction Indiana likely would follow the slight modification of its approach in *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985). In order to recover from a professional for a report rendered to his client, the third party must establish that the professional was aware that the report would be used for a particular purpose, in furtherance of which a known person would rely, and the professional must show an understanding of this impending reliance. 493 N.Y.S.2d at 443, 483 N.E.2d at 118. The district judge found it beyond dispute on this record that Schwartz did not expect that his 1983 letter would be distributed to investors. 733 F.Supp. at 1250–51 & nn. 6–8. Schwartz did not know who would see or rely on the letter and therefore, under *Ultramares*, owed these strangers no duties. This not only knocked out the claim under state law but also meant that the letter could not deceive its audience in violation of federal law—for the promoters knew their own scheme, and Schwartz had no duty to anyone else.

*Ultramares* reflects a judgment that providers of information need protection from the sort of liability that routinely falls on manufacturers of defective products. This may be in part because providers of information have a harder time capturing the benefits of their skills than do sellers of products, see *Greycas, Inc. v. Proud*, 826 F.2d 1560, 1564 (7th Cir.1987), although the issuer of securities can cope with part of this problem by promising to indemnify its professional assistants. A privity rule also likely reflects recognition that damages in securities cases often bear tangential relation to social loss. Pecuniary losses in

securities markets greatly exceed social losses. An error in stating accounts receivable may cause the price of stock to fluctuate; if the price rises unduly, sellers gain at the expense of buyers; when the truth comes out and the prices adjust again the flow is reversed. The fluctuation causes a transfer among investors, rather than a transfer from investors to promoters or their advisers. Litigation seeking to collect the entire price movement from the accountant—while leaving other investors with the gains in their pockets—produces a damages award unrelated to the real loss created by the error (an increase in volatility of stock prices and a slight reduction in the propensity to invest, to the detriment of society at large).

Although considerations of this kind support the *Ultramares* rule when the accountant or lawyer is negligent, they do not support immunity from damages for fraud. The optimal amount of fraud is zero; judges worry less about overdeterrence of socially productive activities (although error in separating fraud from negligence leaves a residuum of concern). *Ultramares* itself was a negligence case, and Judge Cardozo carefully observed that his opinion was not designed to "emancipate accountants from the consequences of fraud." 255 N.Y. at 189, 174 N.E. at 448. Indiana does not apply a privity rule in fraud cases, *Parke County v. Ropak, Inc.*, 526 N.E.2d 732, 736 (Ind.App.1988); *Plymale v. Upright*, 419 N.E.2d 756, 760 (Ind. App.1981). We therefore concluded in *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1284 (7th Cir.1989), that Indiana would not apply *Ultramares* in fraud actions.

Both the fraud and the direct dissemination qualifications of *Ultramares* come into play. Let us start with the latter. Schwartz expressly consented to the distribution of his letter to accountants, attorneys, and tax advisers—that is, to the professional assistants of investors. Schwartz treats these persons as if they were distinct from investors, but they are not. They are agents of investors. To give information to an agent is to give it to the principal. The SEC treats a sophisticated adviser (that is, a "purchaser representative" under Rule 501(h)) as a proxy for a sophisticated investor when deciding the allowable scope of an unregistered § 4(2) or Regulation D offering. See Rule 506(b)(2)(ii). Information sent to such "purchaser representatives" is designed to affect investment decisions. That the effect is indirect is no more a defense to liability than it would be to observe that the erroneous description of a drug's effects appeared in the literature distributed to physicians but was not stuffed in the box when the patient picked up a prescription. Information is given to physicians precisely so that it will affect the choice of drugs; information is given to accountants and tax advisers so that it will affect the choice of investment—sometimes via an investment the agent makes for the client's account, sometimes via the advice the agent gives to the client, and sometimes the agent passes along the information verbatim. Nothing in the rationale of *Ultramares* implies a line between a tax adviser and a taxpayer. Perhaps some of the 101 appellants (who bought one or more units in the 1983 program) did not have attorneys, accountants, or tax counsellors (or had agents who did not get the letter); but those who did receive this information with Schwartz's consent through their agents (or whose agents acted on the basis of the information) are entitled to proceed against its author.

Then there is the matter of fraud. Plaintiffs would like to be able to recover from Schwartz for negligence, but § 10(b) and Rule 10b–5 do not allow this, and we agree with the district judge that neither does Indiana law except to the extent Schwartz authorized the distribution of the letter to the investors' advisers. But if Schwartz acted recklessly, he had the mental state that identifies fraud under both state and federal law. Indiana law allows an action for fraud even when *Ultramares* blocks recovery for negligence. See *Ashland Oil*. The district court's only reason why the record, viewed in the light most favorable to the investors, would not allow an inference of recklessness is that the promoters were the only audience to which

Schwartz owed a duty. That conclusion cannot stand, for it assumes that *Ultramares* interdicts even fraud actions. Under Rule 10b–5, moreover, the lack of an independent duty does not excuse a material lie. A subject of a tender offer or merger bid has no duty to issue a press release, but if it chooses to speak it must tell the truth about material issues. *Basic Inc. v. Levinson,* 485 U.S. 224, 232–36, 108 S.Ct. 978, 983–85, 99 L.Ed.2d 194 (1988). Although the lack of duty to investors means that Schwartz had no obligation to blow the whistle, see *Barker* and, e.g., *Schatz; Renovitch v. Kaufman,* 905 F.2d 1040 (7th Cir.1990); *Latigo Ventures v. Laventhal & Horwath,* 876 F.2d 1322, 1327 (7th Cir. 1989); *Abell v. Potomac Insurance Co.,* 858 F.2d 1104 (5th Cir.1988), vacated on other grounds, 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989); *First Interstate Bank v. Chapman & Cutler,* 837 F.2d 775, 780 n. 4 (7th Cir.1988); *Windon Third Oil & Gas Drilling Partnership v. FDIC,* 805 F.2d 342, 347 (10th Cir.1986), and none to correct a letter he had not authorized to be circulated in the first place (similarly, Basic's press release misrepresenting the negotiating position of the would-be acquiror did not compel the bidder to issue its own press release correcting Basic's bobble), Schwartz cannot evade responsibility to the extent he permitted the promoters to release his letter.

█ Although this is a closer question—and will turn out to be irrelevant if all of the plaintiffs had advisers who received the letter with Schwartz's consent—we also conclude that the district court should not have found that Schwartz withheld authorization for the use of his letter in the offering materials. Schwartz testified by deposition that he told Van Waeyenberghe and Leibowitz not to include the letter in the offering materials. 733 F.Supp. at 1250 n. 7. The investors have no contrary direct evidence, but then Van Waeyenberghe and Leibowitz are not talking. A jury might disbelieve Schwartz's uncorroborated assertion. Several things undercut it: (a) The letter discusses tax consequences for investors, not for MEL or the promoters; what was the point of the document if not

to circulate?; (b) The letter professes adherence to an ABA standard (Formal Opinion 346) that is designed for documents that will be disseminated to investors, supporting an inference that Schwartz contemplated such dissemination (and authorized what he contemplated would occur); (c) Schwartz concedes that he authorized the letter's dissemination to advisers; what was the point of this limit? (The letter might be *more* misleading to a careful tax adviser than to a lay person, because it professes observance to an ABA standard that to a professional would signal a careful investigation.); (d) Schwartz never committed to writing his opposition to the inclusion of the document with the offering materials; is it likely that an attorney would fail to put something so important on paper?; (e) After the inclusion of his letter in the offering circular, Schwartz continued to cooperate with the promoters as if nothing had happened. He proposed an escrow agreement under which $100 of every unit (up to $100,000) would be withheld to finance litigation against the IRS, and he drafted a new letter for the 1984 offering. Although as the district court observed, 733 F.Supp. at 1250 n. 6, this did not ratify any earlier missteps by the promoters, a continuing congenial relation casts doubt on Schwartz's assertion that he withheld authorization. If a jury should conclude that Schwartz authorized the inclusion of the letter with the offering documents, then he appears as a principal—just as all who prepare or sign the registration statement *and its attachments* are principals under § 11(a)(4)—and not as an aider or abettor. (We conform the implied rights of action to the express ones to the extent possible.) The duty to correct statements so long as the offering continues snaps into place. Offering materials must be correct and non-misleading at the time of the sale, and not just as of the time they were written. *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1099–1100 (2d Cir.1972). This duty comes from federal securities law rather than state law. If as the investors submit Schwartz came to doubt the representations in his letter but continued to allow its circulation, this may

be powerful evidence of recklessness, and so establish liability under § 10(b) and Rule 10b–5.

### III

Schwartz offers in support of his judgment a ground on which he lost in the district court: that his errors did not cause the investors' loss. Causation is an essential element of liability. *LHLC Corp.*, 842 F.2d at 931; *Bastian v. Petren Resources Corp.*, 892 F.2d 680 (7th Cir.1990). In the district court Schwartz insisted that the source of the investors' loss was the promoters' making off with the money, and that errors in his letters did not cause this loss. To this the district court responded that "had the facts been as represented to investors in the opinion letter, the plaintiffs would not have suffered a loss". 733 F.Supp. at 1246. (To be precise, the district judge said that the evidence, taken in the light most favorable to the investors, could support such a conclusion.) This is a sensible appreciation of the current state of the evidence.

Schwartz insists that the district judge should have segregated the loss attributable to the IRS's denial of credits and deductions from the loss attributable to the principals' defalcations. Although such a line may be appropriate, it cannot support the judgment. Unless Schwartz knocks out the possibility of any damages the case must continue, with apportionment in the hands of the triers of fact. On remand the district court should consider this question along with the many other issues that remain for decisions.

The judgment is affirmed to the extent it grants judgment for the defendants on state and federal versions of RICO, state securities law, and § 12 of the '33 Act (plus theories of aiding and abetting a violation of § 12) and determines that Indiana law governs state-law claims. The judgment is otherwise reversed, and the case is remanded for further proceedings consistent with this opinion.