OPINION OF THE COURT
ROTH, Circuit Judge:
This appeal arises from a suit alleging, among other things, violations of § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), in connection with plaintiffs’ investment in forward contracts through defendant First Western Government Securities (“First Western”). Defendant Arvey, Hodes, Costello & Burman (“Arvey”), a Chicago law firm, issued three opinion letters concerning the tax consequences of these investments. Plaintiffs Ernest P. Kline and Eugene F. Knopf allege that Arvey’s opinion letters contained both affirmative misrepresentations and material omissions in their treatment of these transactions. They further contend that they relied upon these opinion letters in deciding to invest with First Western and that as a result they incurred substantial financial losses. The district court denied Arvey’s motion for summary judgment on the misrepresentation claim but granted it on the omissions claim. We conclude that both the misrepresentation and omissions claims should be tried. We will therefore affirm in part and. reverse in part, and we will remand the ease to the district court for further proceedings consistent with this opinion.
I.
It is important to emphasize at the outset that, because we are reviewing the partial grant of a motion for summary judg *482 ment, we must view the facts in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, “[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986).
The central figure in this case is defendant Sidney Samuels, who founded First Western in 1978. Prior to that time Samuels was a general partner in Price & Company (“Price”). According to plaintiffs, First Western’s trading program was substantially similar to Price’s and indeed was modeled on it. Significantly, Arvey represented both Price and First Western. Arvey assisted Samuels and his partner, Larry Price, in the formation of Price, drafted Price’s limited partnership agreement and its 1977 offering memorandum, and represented it in connection with IRS civil and criminal investigations. Arvey began assisting Samuels in setting up First Western while he was still a general partner in Price. The firm became First Western’s general counsel and assisted in the drafting of forms to be used by First Western, including the brochure describing the program. There is some suggestion in the record that Arvey helped design the straddle transactions used by First Western. (Joint Appendix (“JA”) at 154.) At First Western’s request, Arvey also provided it with three opinion letters addressing the federal income tax treatment of these transactions. These opinion letters were dated September 20,1978, June 8,1979, and November 12, 1980.
The transactions engaged in by First Western involved forward contracts to purchase and sell money market instruments, specifically Government National Mortgage Association securities (“GNMA’s”) and Federal Home Loan Mortgage Corporation participation certificates (“FMAC’s”). A “forward contract” is a contract to purchase or sell a specified security, at a designated interest rate, on a fixed future date. In a straddle transaction an investor enters into a pair of forward contracts, agreeing both to buy and sell securities in the future. The difference between the “buy” contract and the “sell” contract results in a “spread” position, resulting in gain or loss to the investor depending on whether interest rates rise or fall. Accordingly, before entering into a straddle an investor must decide how to “bias” the spread by predicting whether interest rates will rise or fall.
First Western’s agreements with its customers provided that a customer could arrange for the cancellation of his obligations under a forward contract prior to the settlement date. First Western would then “charge or credit the customer’s account with an amount equal to the profit First Western or the customer, respectively, would be entitled to receive in the event delivery was effectuated pursuant to such contract as of the date of cancellation.” (Arvey Opinion Letters, 9/20/78, JA at 138; 6/8/79, JA at 562.) Typically investors would choose to cancel the losing side of their straddle. The tax treatment of the resulting loss was the subject of the Arvey opinion letters.
In the opinion letters Arvey concluded that, if First Western and a customer agreed “to cancel a forward contract prior to its settlement date, the consequent gain or loss realized by the customer should constitute ordinary gain or loss to be recognized by the customer in the year in which the contract is canceled.” (Arvey Opinion Letter, 6/8/79, JA at 563.)[1] The three letters also contained language advising First Western that the Internal Revenue Service and the courts might arrive at a contrary conclusion.
As the following excerpts show, each of the letters also provided that the opinions were based on facts as provided by First Western and were for the use of First Western only:

September 20, 1978, letter:

The following paragraphs contain a summary of such transactions as you [First Western] have described them to us. (JA at 135.)
*483 [T]his opinion is subject to the consummation of the transactions between First Western and its customers under the facts and conditions described above and is further expressly conditioned on your representation that the transactions entered into by First Western and its customers will be for the purpose, and with a reasonable expectation, of economic gain. (JA at 140.)
This letter is intended for your personal use only and is not intended to be, and should not be, relied upon by persons other than First Western. (JA at 149.)

June 8, 1979, letter:

You have advised us that the facts set forth below constitute an accurate and complete presentation of all relevant information with regard to such transactions. (JA at 558.)
[TJhis opinion is subject to the consummation of the transactions between First Western and its customers pursuant to the facts and conditions described above and is further expressly conditioned on your representation that such transactions will be consummated by the customers of First Western with a reasonable expectation of economic gain. (JA at 563.)
This letter is intended for your personal use only and is not intended to be, and should not be, relied upon by persons other than First Western. (JA at 574.)

November 12, 1980, letter:

You have advised us that the facts set forth below constitute an accurate and complete presentation of all relevant information with regard to the transactions between First Western and its customers, and that no material fact necessary to make the information herein not false or misleading has been omitted. (JA at 576.) [T]he conclusions set forth herein are based upon the facts and conditions described in this letter as you have represented them to us and we express no opinion as to the tax treatment of any transaction to the extent the facts may differ from those contained herein.
We express no opinion concerning any federal income tax consequence other than as specifically set forth in this letter, and no opinion is expressed with respect to state and local taxes, federal or state securities laws, or any other federal or state law not explicitly referenced herein. We also express no opinion as to the advisability of undertaking any transaction described in this letter, in that any such determination must take into account the individual facts and circumstances affecting the particular taxpayer.
This letter is intended solely for the internal use of First Western and, accordingly, it is not intended to be, and should not be, relied upon by any person other than First Western. Further, this letter is not to be quoted or otherwise referred to in any documents, including financial statements of First Western, nor is it to be filed with or furnished to any government agency or other person without the express prior written consent of this firm. Such consent has not been given, and will not be given, unless the person to whom this letter is to be furnished has previously agreed, in writing, that he will not rely upon the opinions and conclusions expressed herein, but will make his own independent evaluation of the federal income tax consequences of any transactions to be entered into with First Western. (JA at 591.)
A couple of themes emerge from these excerpts. First, Arvey stressed that its view of the transactions’ validity hinged on whether they were entered into with a reasonable expectation of generating a profit. Second, the letters asserted that Arvey’s conclusions might be changed by facts and circumstances unique to individual customers’ accounts. Arvey also made these points in response to inquiries from potential First Western customers about its opinion letters. (JA at 365-77.)
Despite the letters’ statement that they were for the exclusive use of First Western, Arvey was aware at least as early as May 31, 1979, that its opinion letters had reached potential investors. (JA at 365.) The record before us reflects some ten instances in which potential First Western investors contacted Arvey regarding its opinion. (JA at 365-78.) As the following excerpt from an *484 October 21, 1980, letter to Arvey from an attorney representing a potential investor makes clear, Arvey was put on notice that its efforts to dissuade reliance were not always successful:
Surely you realize that First Western Government Securities is using your letter in an effort to obtain investors and is furnishing copies of your letter with brochures indicating the mechanical operation of the program. As a result, notwithstanding statements made in your October 16, 1980, letter, please be advised that my client is awaiting my receipt of your opinion letter before making a decision as to his investment with First Western Government Securities. (JA at 376.)
Plaintiffs Kline and Knopf invested in forward contracts with First Western in December 1980, after reading and relying upon Arvey’s June 1979 and November 1980 opinion letters. They incurred losses on their investments, deducted these losses in their income tax filings, and had their deductions disallowed by the IRS.
Kline and Knopf allege that Arvey knew or recklessly disregarded the truth about First Western’s trading program. As a result, they contend, Arvey in its opinion letters made material misrepresentations and omitted material facts concerning the actual structure of First Western transactions. Plaintiffs allege a number of misrepresentations. They allege that the opinion letters stated that under the First Western trading program investors would be required to make or accept delivery of the underlying securities when in fact no such requirement existed. They allege that the opinion letters represented that the prices of First Western’s contracts moved independently, and thus subject to market risk, when in fact First Western’s computer trading program artificially set the prices to eliminate any risk of loss.[2] They allege misrepresentations as to whether customers would be required to make additional margin deposits and as to how First Western calculated the fees it charged for cancellation of contracts. Finally, they allege that the opinion letters misrepresented the fact that First Western’s transactions were designed to obtain tax losses and as structured could not support a reasonable expectation of economic gain.
As for material omissions, plaintiffs allege that Arvey made no reference to prior IRS investigations of Price & Company or Sidney Samuels’ connection to that firm.[3] Furthermore, a number of investigations into First Western’s trading program had commenced by the time Arvey issued its final opinion letter. The IRS had audited a number of First Western investors, the SEC had started an investigation and requested numerous documents from First Western, and the Minnesota Department of Commerce was investigating First Western. The only reference to these activities in the November 12, 1980, opinion letter was as follows: “Further, you have informed us that customers of First Western are being audited by the Service and that the Service has questioned the de-ductibility of losses realized by customers on the basis of the theory set forth by the Service in Rev.Rul. 77-185.” (JA at 588.) The letter made no mention of the SEC or State of Minnesota investigations, or the IRS investigation into Price.
*485 Arvey moved for summary judgment on the omissions claim, the misrepresentation claim, and tort and RICO claims not before us on this appeal. The district court denied summary judgment on all counts except those asserting liability for omissions of material fact. Because the district court believed that this case presents two “ ‘controlling issues of law as to which there is a substantial ground for difference of opinion,’ ” Kline v. First Western Gov’t Secs., 794 F.Supp. 542, 557 (E.D.Pa.1992) (quoting 28 U.S.C. § 1292(b)), it certified for immediate appeal the following two issues: first, whether an attorney may be held liable for alleged misrepresentations of fact in an opinion letter when those alleged factual statements have been specifically attributed to another individual; and, second, whether attorneys may be held liable for omissions of fact in an opinion letter absent a duty to disclose.[4] The district court also ruled that Arvey did not meet its burden of proving that plaintiffs’ reliance was unreasonable, id. at 552-54, but did not certify that issue for appeal.
II.
The district court had subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331. This court has jurisdiction over this certified interlocutory appeal pursuant to 28 U.S.C. § 1292(b). This court granted both parties’ petitions to appeal on June 8, 1992.
Our review of a district court’s grant of summary judgment is plenary. Erie Telecommunications, Inc. v. City of Erie, 853 F.2d 1084, 1093 (3d Cir.1988). “On review the appellate court is required to apply the same test the district court should have utilized initially.” Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir.1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).
A court may grant summary judgment only when the submissions in the record “show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c). “The inquiry performed is the threshold inquiry of determining whether there is the need of a trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.” Anderson v. Liberty Lobby, 477 U.S. at 250, 106 S.Ct. at 2511. Stated differently, “a motion for summary judgment must be granted unless the party opposing the motion can produce evidence which, when considered in light of that party’s burden of proof at trial, could be the basis for a jury finding in that party’s favor.” J.E. Mamiye & Sons, Inc. v. Fidelity Bank, 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring). Thus, the party opposing summary judgment “must do more than simply show that there is some metaphysical doubt as to material facts.” Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986).
III.
The district court in its resolution of Ar-vey’s motion for summary judgment relied on the distinction between liability imposed under Rule 10b-5 for misrepresentations and that imposed for omissions. While this distinction is significant in some circumstances,[5] we do not find it helpful to resolving the particular issues presented in this case. We conclude instead that attorneys may be liable *486 for both misrepresentations and omissions where the result of either is to render an opinion letter materially inaccurate or incomplete.

A. The Misrepresentations Claim

Arvey argues that the district court erred in denying summary judgment in its favor on plaintiffs’ claims that Arvey is liable under the federal securities laws for affirmatively misrepresenting material facts concerning First Western’s trading program. Arvey contends that it was entitled to summary judgment on this claim for the simple reason that its opinion letters did not contain any misrepresentations. That is, it asserts that as a matter of law it cannot be held liable for an opinion letter in which it made explicit that it was basing its opinion on an assumed set of facts represented to it by its client and that it had conducted no independent investigation into whether those represented facts accurately reflected reality. We are unpersuaded by this argument.
This court has generally recognized securities fraud claims based on allegations of misrepresentations in opinion letters. We have held that “[a]n opinion or projection, like any other representation, will be deemed untrue for purposes of the federal securities laws if it is issued without reasonable genuine belief or if it has no basis.” Herskomtz v. Nu-tri/System, Inc., 857 F.2d 179, 184 (3d Cir. 1988), cert. denied sub nom. Nutri/System, Inc. v. Herskomtz, 489 U.S. 1054, 109 S.Ct. 1315, 103 L.Ed.2d 584 (1989). Interpreting the Supreme Court’s “scienter” or intent requirement as articulated in Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), we have explained that
an opinion must not be made “with reckless disregard for its truth or falsity,’ or with a lack of ‘genuine belief that the information disclosed was accurate and complete in all material respects.’ Therefore, an opinion that has been issued without a genuine belief or reasonable basis is an ‘untrue’ statement which, if made knowingly or recklessly, is culpable conduct actionable under § 10(b) and Rule 10b-5.
Eisenberg v. Gagnon, 766 F.2d 770, 776 (3d Cir.1985) (citations omitted), cert. denied sub nom. Wasserstrom v. Eisenberg, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1986).
Eisenberg concerned litigation over a tax shelter involving the sale of coal rights. The defendant law firm had prepared a tax opinion letter, which was included in the offering memoranda, in which it opined that the IRS would allow certain deductions. Plaintiffs alleged that the law firm knew that there was no reasonable basis for its opinion. We held that the law firm and an accounting firm that issued an opinion letter verifying profit projections included in the offering memo-randa “are liable if they recklessly expressed opinions which they had good reason to believe were baseless.” Id. at 778. We explained that such liability is proper because of the greater information possessed by professionals who express opinions upon which third parties would rely.
When a representation is made by professionals or ‘those with greater access to information or having a special relationship to investors making use of the information,’ there is an obligation to disclose data indicating that the opinion or forecast may be doubtful. When the opinion or forecast is based on underlying materials which on their face or under the circumstances suggest that they cannot be relied on without further inquiry, then the failure to investigate further may ‘support an inference that when the defendant expressed the opinion it had no genuine belief that it had the information on which it could predicate that opinion.’
Id. at 776 (citations omitted).
Herskomtz presented this court with a similar situation. In that case, we held that a securities fraud claim against a bank that had issued an opinion letter concerning the fairness of the transaction should be submitted to a jury when the claim alleged that the bank knew that the assumptions on which it based its opinion were unfounded. Herskowitz, 857 F.2d at 184-85. See also Sharp v. Coopers & Lybrand, 649 F.2d 175, 184 (3d Cir.1981), cert. denied, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982) (recognizing securities fraud claim against accounting firm based on materially false representations contained in opinion letter).
*487 These cases leave no doubt concerning the existence of a cause of action for knowing or reckless misrepresentations in opinion letters. The question we must address, then, is whether Arvey’s disclaimers, to the effect that the opinion was based only on facts provided to it by Samuels, should lead us to conclude otherwise than that this case should go to trial. The district court relied on Gilmore v. Berg, 761 F.Supp. 358 (D.N.J.1991), in concluding that the disclaimers should not have that effect. We agree with that analysis.
Gilmore involved a claim against an attorney who, in a tax opinion letter, represented that the purchase price of the real property involved in the tax shelter at issue was fair “as determined by the general partner.” Id. at 370. Plaintiffs contended that the attorney knew that the property had been purchased out of bankruptcy for less than one-half the stated price. The court stated:
The court agrees with plaintiffs that a jury could find [the attorney’s] statement that “the purchase price of $5.3 million reflects the fair market value of the property as determined by the general partner” is so grossly misleading as to constitute actionable fraud in failing to disclose important facts underlying the determination of fair market value. [The attorney] seeks to exculpate his misleading statement by pointing to the qualifying language, “as determined by the general partner.” However, plaintiffs have presented evidence that ... [he] knew that the fair market value of $5.3 million was insupportable.

Id.

The analysis in Gilmore, we believe, follows directly from Eisenberg and this court’s other cases concerning liability for opinion letters. We held in Eisenberg that professionals and others with similar access to information must disclose data that calls into question the accuracy of an opinion. 766 F.2d at 776. This responsibility cannot be evaded by the inclusion of a statement that the opinion is based on facts provided by someone else. Thus, when a law firm knows or has good reason to know that the factual description of a transaction provided by another is materially different from the actual transaction, it cannot escape liability simply by including in an opinion letter a statement that its opinion is based on provided facts.
Plaintiffs here have alleged that Arvey had a long and close relationship with Samuels, which extended to assisting him in setting up First Western, designing the transactions in which First Western engaged, and acting as First Western’s general counsel. Plaintiffs also point to Arvey’s representation of Price, the firm on which First Western allegedly was modeled, in IRS audit proceedings. These allegations clearly permit the inference that Arvey knew or had good reason to know that the factual assertions contained in its opinion letters did not reflect the substance of actual First Western transactions. As such, Arvey’s opinions, despite their disclaimers, fall squarely within the category of opinion letters that we have held to be actionable.
That said, we feel it necessary to emphasize that there is a distinction between the issue we have just addresses — whether the presence of disclaimers precludes an action for misrepresentations — and the question of whether plaintiffs reasonably relied on the opinion letters. As this court has noted, a plaintiff bringing suit under § 10(b) and Rule 10b-5 must prove that the defendant (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs’ reliance was the proximate cause of their injury. In re Phillips Petroleum Secs. Litig., 881 F.2d 1236, 1244 (3d Cir.1989).
Thus far we have been concerned with the first of these issues — whether Arvey is entitled to summary judgment based on its contention that its opinion letters did not contain misrepresentations because of the presence of the disclaimers. Whether plaintiffs’ reliance on Arvey’s opinion letters was reasonable pursuant to the standard we articulated in Straub v. Vaisman & Co., 540 F.2d 591, 598 (3d Cir.1976), presents a separate issue. The presence and character of disclaimers has clear relevance to that determination.
*488 The district court concluded that Arvey has not met its burden of showing that plaintiffs’ reliance on the opinion letters was unreasonable, Kline v. First Western Gov’t Secs., 794 F.Supp. at 552-54, and we believe that the record supports its conclusion. Although, as we have noted, the district court did not certify the reliance issue for our review, we nevertheless feel it necessary to address the issue briefly because under § 1292(b) “it is the order that is appealable, and not the controlling question; and thus we may address any issue necessary to decide the appeal before us.” Ivy Club v. Edwards, 943 F.2d 270, 275 (3d Cir.1991), cert. denied sub nom. Del Tufo v. Ivy Club, - U.S.-, 112 S.Ct. 1282, 117 L.Ed.2d 507 (1992). See also United States v. Stanley, 483 U.S. 669, 677, 107 S.Ct. 3054, 3060, 97 L.Ed.2d 550 (1987). Thus we could reverse the denial of summary judgment if, like the dissent, we felt that plaintiffs’ reliance was unreasonable as a matter of law.
,In Straub we stated that a variety of factors should be considered in determining whether plaintiffs’ reliance was reasonable, including: (1) the existence of a fiduciary relationship; (2) plaintiffs’ opportunity to detect the fraud; (3) the sophistication of the plaintiffs; (4) the existence of long-standing business or personal relationships; and, (5) access to the relevant information. 540 F.2d at 598. Consideration of the evidence before us in light of these factors, we believe, leads inexorably to the conclusion that there exists a genuine issue of material fact as to whether plaintiffs’ reliance was reasonable so that the denial of summary judgment on this ground was proper.
We acknowledge that the first and fourth factors weigh in favor of Arvey. The rest, however, favor plaintiffs. There is no evidence suggesting that plaintiffs had access to information that would have allowed them to understand that which they allege was really taking place. Arvey, on the other hand, had an ongoing attorney-client relationship with First Western and Samuels. Nor is there a suggestion that plaintiffs had an opportunity to detect the alleged fraud even without the benefit of access to such information. And while Arvey argues that plaintiffs were sophisticated investors, the evidence does not compel the conclusion that they were so sophisticated in these matters that they should have recognized that the descriptions of the transactions in the opinion letters bore little relation to reality.[6] A potential First Western investor, armed with Arvey opinion letters and the information about his own account that Arvey stressed might be important, could have obtained a tax opinion from his attorney that would have been wrong simply because of the misleading way in which the program allegedly was described in the opinion letters.[7] Mere reliance on the legal conclusions expressed in the opinion letters, without more, would have been unreasonable. But we cannot say as a matter of law that it was unreasonable to rely on the description of First Western’s trading program. Indeed, such reliance would be consistent with the disclaimers insofar as an independent legal opinion was sought on the basis of the description of the program.
 In addition to disputing our application of Straub to this case, the dissent feels *489 that Arvey is entitled to summary judgment based on the “bespeaks caution” doctrine. Under that doctrine
when an offering document’s forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the ‘total mix’ of information the document provided investors. In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.
In re Donald J. Trump Secs. Litig., 7 F.3d 357, 371 (3d Cir.1993). See also Donald C. Langevoort, Disclosures that “Bespeak Caution”, 49 Bus.Law. 481 (1994) (summarizing and analyzing “bespeaks caution” jurisprudence). Not just any cautionary language will trigger application of the doctrine. Instead, disclaimers must relate directly to that on which investors claim to have relied. As we noted in Trump, “a vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge.” 7 F.3d at 371-72.
So conceived, the “bespeaks caution” doctrine clearly does not apply to this case except to the extent that plaintiffs relied solely and without further investigation or consideration on the opinion letters’ conclusions as to the tax consequences of the First Western transactions. The cautionary statements in the opinion letters provided investors with information that should have suggested nothing more to them than the possibility that Arvey might have gotten the law wrong or incorrectly assessed the risk that the IRS would deny deductions. The opinion letters did not contain statements from which plaintiffs should have inferred the risk that Arvey was knowingly or recklessly misstating the structure of the entire First Western trading program.
In the only other case that we have found concerning a similar situation the court reached the same conclusion. The court in Griffin v. McNiffi 744 F.Supp. 1237 (S.D.N.Y.1990), aff'd without op., 996 F.2d 303 (2d Cir.1993), provided the following account of the case and its resolution:
Plaintiffs ... challenge more than just the future forecasts and predictions in the offering materials. They argue that the underlying assumptions of the PPMs, tax opinions and projections were designed to mislead the investors into believing that the partnership investments offered them the opportunity to achieve a profit and a tax benefit from their investment, when in reality defendants knew that these possibilities did not exist_ Inasmuch as certain of these allegations go to the misleading nature of the statements when made, the existence of cautionary language regarding the general unpredictability of, inter alia, oil and gas operations, economic trends, and the interpretation of the tax laws, will not bar plaintiffs from maintaining their claims against the remaining defendants.
Id. at 1253-54 (footnote omitted).
In order for there to be a plausible argument for application of the “bespeaks caution” doctrine in this case more than the simple assertion that the opinion is based on represented facts is required. Trump requires that the language bespeaking caution relate directly to that by which plaintiffs claim to have been misled. 7 F.3d at 371-72. Under the law regarding omissions, discussed in the next section, Arvey’s statement that its opinion was based on facts represented to it by First Westérn also contained the implicit assertion that Arvey did not know the facts to be otherwise. It could not therefore have alerted plaintiffs to the possibility that Arvey did know otherwise. Thus, for the doctrine to even conceivably preclude plaintiffs’ claims in this case it would be necessary for the letters to have included a disclaimer stating, in essence, that there was a possibility that Arvey did know otherwise and that the opinion letter was a sham commissioned to construct a facade of legitimacy for a trading program that both First West *490 ern and Arvey knew was a farce.[8] We find no such language and therefore conclude that Arvey was not entitled to summary judgment in its favor on the basis that plaintiffs’ reliance was unreasonable as a matter of law.

B. The Omissions Claim

The district court granted summary judgment for Arvey on all claims to the extent that they alleged liability for omissions of material fact. The court reasoned that attorneys cannot be held liable for omissions in an opinion letter unless plaintiffs can demonstrate that the attorneys had a duty to disclose to them the information that was omitted. Id. at 550-51. Because it concluded that plaintiffs did not show the existence of a fiduciary or other relationship which would give rise to such a duty, the court held that plaintiffs could not proceed with their claims based on Arvey’s alleged omissions.
We believe the district court’s analysis misapprehends the issues presented by this case. We are dealing here with a situation in which Arvey, by authoring its opinion letters, has elected to speak regarding the transactions at issue. Plaintiffs allege that this speech was misleading because Arvey failed to include in its opinion letters information that, if included, would have undermined the conclusions reached in those letters. In contrast, the cases cited by the district court, as vyell as those cited by Arvey, for the proposition that attorneys may not be held liable for omissions absent a duty to disclose concern the question of whether a law firm or similar entity has a duty to “blow the whistle” on its client. See Fortson v. Winstead, McGuire, Sechrest & Minick, 961 F.2d 469 (4th Cir.1992); Abell v. Potomac Ins. Co., 858 F.2d 1104 (5th Cir.1988), cert. denied sub nom. Abel v. Wright, Lindsey & Jennings, 492 U.S. 918, 109 S.Ct. 3242, 106 L.Ed.2d 589 (1989); Barker v. Henderson, Franklin, Starnes & Holt, 797 F.2d 490 (7th Cir.1986). That is, those cases concerned situations where the alleged omissions were unrelated to the validity of the law firm’s opinion letter or similar communication.
Fortson, for example, concerned a suit against a law firm that had prepared a tax opinion letter that was included in the private placement memorandum used in the offering of interests in a real estate limited partnership. Plaintiffs “sought to recover from Winstead on the ground that the firm breached its duty under federal securities laws and state common law by failing to inquire into and ensure complete and accurate disclosure.” Fortson, 961 F.2d at 471. Plaintiffs did not allege that the tax opinion was inaccurate. “Instead, they challenged] the sufficiency of the information provided to them as potential investors and contended] that Winstead had a responsibility to ensure full and accurate disclosure.” Id. at 472. The court refused to impose this obligation on law firms in the absence of a fiduciary relationship between the law firm and the plaintiffs. Id. at 472-74. To do so, the court remarked, would be to make attorneys “guarantors of integrity in all commercial transactions, whether the context be one of raising capital, marketing a product, or negotiating a contract. Lawyers, in short, would function in the business world as designated watchdogs.” Id. at 475. See also Barker, 797 F.2d at 496 (“When the nature of the offense is a failure to ‘blow the whistle’, the defendant must have a duty to blow the whistle. And this duty does not come from § 10(b) or Rule 10b — 5; if it did the inquiry would be circular. The duty must come from a fiduciary relation outside securities law.”).
This case, in contrast, presents the question of whether, once a law firm has chosen to speak, it may omit facts material to its *491 non-eonfidential opinions. Here, unlike Fort-son, the allegedly omitted facts bear directly on the accuracy of the tax opinion. Thus, this situation closely resembles that before the Seventh Circuit in Ackerman v. Schwartz, 947 F.2d 841 (7th Cir.1991). In Ackerman investors brought suit against a law firm that wrote an opinion letter concluding that the investors were entitled to certain deductions for their investments in a tax shelter. The opinion letter recited facts that made the transaction seem legitimate, but were fictitious. The letter cautioned that the firm had “relied on unnamed persons for unspecified facts,” id. at 848, and added that “ ‘[w]e have not made an attempt to independently verify the various representations.’” Id. The court held that the district court’s grant of summary judgment in favor of the law firm was improper.
Under Rule 10b-5 ... the lack of an independent duty does not excuse a material lie. A subject of a tender offer or merger bid has no duty to issue a press release, but if it chooses to speak it must tell the truth about material issues. Although the lack of duty to investors means that Schwartz had no obligation to blow the whistle, and none to correct a letter he had not authorized to be circulated in the first place ... Schwartz cannot evade responsibility to the extent he permitted the promoters to release his letter.
Id. at 848 (citations omitted).
This analysis flows naturally from Eisenberg. There we held that an opinion is actionable if issued “with a lack of a genuine belief that the information disclosed was accurate and complete in all material respects.” 766 F.2d at 776. Indeed, when the foundations of an opinion “suggest that they cannot be relied on without further inquiry, then the failure to investigate further may ‘support an inference that when the defendant expressed the opinion it had no genuine belief that it had the information on which it could predicate that opinion.’” Id. (citations omitted). Thus, this court has adopted a limited duty to investigate and disclose when, by the drafter’s omission, a public opinion could mislead third parties.
This limited duty not to omit was particularly well-articulated in Rose v. Arkansas Valley Envtl. & Util. Auth., 562 F.Supp. 1180, 1206-08 (W.D.Mo.1983). The Rose court, in holding that an attorney’s failure to disclose material facts in a bond opinion letter formed the basis of an actionable securities fraud claim, explained that when a professional “undertakes the affirmative act of communicating or disseminating information,” there is
a general obligation or “duty” to speak truthfully; or, alternatively stated, a “duty” not to communicate something which is known to be untrue (or, perhaps, in which the defendant has so little basis for honest belief that the requisite degree of “recklessness” is involved). And encompassed within that general obligation is also an obligation or “duty” to communicate any additional or qualifying information, then known, the absence of which would render misleading that which was communicated. While this latter “duty” might loosely be described as a “duty to disclose,” I would prefer, for purposes of distinguishing it from a true “duty to disclose,” ... to label it as a “duty not to omit.” In reality, it is simply one facet of the general obligation to speak truthfully, arising out of and because of an affirmative act by the defendant in communicating.
Id. at 1207 (citations omitted).
The record contains evidence sufficient to preclude summary judgment on the omissions claim. Arvey received inquiries concerning its opinion letter from potential investors prior to issuing its second letter and was explicitly told prior to issuing its third letter that First Western was distributing copies of its letters along with brochures describing the program. Plaintiffs have alleged that Arvey failed to disclose the SEC and State of Minnesota investigations as well as the IRS investigation into the analogous Price trading program. This evidence creates genuine issues of material fact sufficient to defeat Arvey’s motion for summary judgment.
Finally, we must address Arvey’s argument that a duty not to omit runs against the ethical standards of attorney conduct. *492 This argument is unpersuasive. Privileges and ethical rules cannot be relied on to perpetrate fraud. See Clark v. United States, 289 U.S. 1, 15, 53 S.Ct. 465, 469-70, 77 L.Ed. 993 (1933) (“The privilege takes flight if the relation is abused. A client who consults an attorney for advice that will save him in the commission of a fraud will have no help from the law. He must let the truth be told.”).
IV.
For the foregoing reasons, we will reverse the district court’s decision granting summary judgment for Arvey on plaintiffs’ claim that Arvey’s tax opinion letters contained material omissions upon which plaintiffs relied. We will affirm the district court’s opinion in all other respects, and will remand for proceedings consistent with this opinion.

. The September 20, 1978, and the November 12, 1980, letters contain essentially the same language. (JA at 139-40, 578.)

. Plaintiffs contend that the prices set by First Western’s computer program bore virtually no relation to actual market prices. They point to a study of the First Western trading program undertaken by Professor E. Philip Jones of Harvard Business School. Following a thorough analysis of First Western's operations, including a review of the assumptions used in the computer pricing program, Professor Jones concluded as follows:
First Western's portfolios were a sham. There was no independent movement of prices of different contracts. Most of the risk on one side of a portfolio was exactly cancelled by the risk on the other side of the portfolios.... This cancellation of risk was accomplished by ignoring market prices for GNMAs and FHLMCs, in favor of artificial pricing calculations that resulted in prices which were substantially different from market prices.
(JA at 527.)

. As noted above, plaintiffs allege that First Western's trading program was modeled after Price's. Thus, plaintiffs allege that Arvey should have disclosed the fact that, before Arvey issued its 1979 opinion letter, the IRS had undertaken a criminal investigation into Price's operations. The IRS investigations ultimately led to a finding that Price's trades were sham transactions. Price v. Commissioner, 88 T.C. 860, 1987 WL 49303 (1987).

. Plaintiffs sued defendant Arvey under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78© and Rule 10(b)(5), 17 C.F.R. 240.10b-5, both as an aider and abettor in Count I of the complaint and a primary violator in Counts IV and VI. We note that in Central Bank v. First Interstate Bank, the Supreme Court ruled that “a private plaintiff may not maintain an aiding and abetting suit under § 10(b).” -U.S.-, 114 S.Ct. 1439, 128 L.Ed.2d 119 (U.S.1994). This ruling would appear to bar plaintiffs' claims against Arvey in Count I, a point which we do not now decide. However, we do not believe it affects our analysis with respect to whether Ar-vey may be held liable for material misrepresentations or omissions as a primary violator under Counts IV and VI.

. For example, the Supreme Court has held that in cases “involving primarily a failure to disclose,” i.e., omissions, reliance may be presumed. Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972).

. Unlike the dissent, we do not believe that the fact that “the transactions discussed in the opinion letters were meant for sophisticated investors," Dissent at 497, means that plaintiffs were in fact sophisticated enough to unravel First Western's scheme. And while the "cutting edge” nature of these transactions perhaps should have put plaintiffs on notice of potential tax complications involving the transactions described in the opinion letters, id., it has no logical connection to whether plaintiffs should have suspected that Arvey knowingly misdescribed the transactions.

. The dissent contends that “there is no way that another attorney could have confirmed from the letters themselves that the facts underlying the opinions were correct as they were solely within the knowledge of First Western.” Dissent at 498. Plaintiffs’ claim, however, is that Arvey also knew or should have known that the descriptions of the transactions in the opinion letters were inaccurate. We believe the record contains evidence sufficient to support the inference that Arvey had or should have had such knowledge, thereby creating a genuine issue of material fact. Assuming Arvey possessed such knowledge, its recitations of the facts "as provided to it by First Western” were made without a genuine belief in their validity and thus actionable under the law as expounded in the body of our opinion.

. We note, however, that we do not decide at this time whether such a disclaimer would be effective. One court has noted that "it would appear that the doctrine does not apply unless the projection at issue reflects an honestly held belief." Gurfein v. Sovereign Group, 826 F.Supp. 890, 908 (E.D.Pa.1993) (Poliak, J.). Judge Poliak further remarked that if the rule were otherwise
one could construct a completely inaccurate and fraudulent offering memorandum, yet be shielded from a fraud claim as long as there was language in the document cautioning investors of the specific risks. To the extent that such a rule would allow, if not encourage, fraud and non-disclosure on the part of corporate actors, it clearly is not a viable application of the "bespeaks caution" doctrine.
Id. at 908 n. 20.